**BILL WALKER & ASSOCIATES, INC.,**
**Plaintiff/Appellee,**

v.

**Mark PARRISH, d/b/a Parco Enterprises, Inc., Defendant/Appellant.**

Court of Appeals of Tennessee,
Middle Section, at Nashville.

Feb. 10, 1989.

Permission to Appeal Denied by
Supreme Court May 1, 1989.

 

David M. Smythe, King & Ballow, Nashville, for plaintiff/appellee.

Steve North, Nashville, for defendant/appellant.

## OPINION

KOCH, Judge.

This appeal involves a dispute over a contract to advertise several country music concerts in Texas. The public relations agency that performed the services filed suit in the Chancery Court for Davidson County after the promoter refused to pay. Following a bench trial, the trial court found that the promoter was personally liable for the debt and awarded the agency $23,728.97. The promoter has appealed. We affirm the judgment but for reasons different from those relied upon by the trial court.

### I.

Mark A. Parrish is an accountant and real estate broker who has been involved in various aspects of the entertainment industry in Nashville for many years. He staged and promoted concerts in 1960's and, more recently, owned and operated a hockey team called the Nashville Dixie Fliers.

In 1985, Mr. Parrish was approached by Xavier Cossé, a former employee, about promoting concerts again. Mr. Cossé had some prospects but no funds. Mr. Parrish agreed that he would provide the financial backing for the venture and that Mr. Cossé would look after the day-to-day operation of the business. Mr. Parrish formed Pioneer American Realty Co., Inc. ("Pioneer American") as the corporate vehicle for the venture. He and Mr. Cossé referred to the corporation as "PARCO" or "PARCO, Inc." because they had done business under this name before.

Mr. Parrish's and Mr. Cossé's first venture was a Perry Como concert in Nashville in September, 1985. As their next venture, they undertook to present a series of concerts between January 8 and 11, 1986, in

Texas starring the Mills Brothers, Boots Randolph, and Floyd Cramer.

In November, 1985, Mr. Cossé contracted with Bill Walker & Associates, Inc. ["BWA, Inc."], a Nashville public relations firm, to assist with the marketing and promotion of the Texas concerts. BWA, Inc. agreed to develop a publicity campaign for the concerts, to prepare press kits, and to prepare and place newspaper, television, and radio advertisements for the concerts in the proper markets.

BWA, Inc. began to develop the campaign and to prepare the advertising copy. In the latter part of November, 1985, it requested funds to be used to buy newspaper advertising space. Mr. Cossé told the agency that he would "get with Mr. Parrish and get the money." However, because the deadline for reserving newspaper space was quickly approaching, BWA, Inc.

used its own funds to buy the space. Mr. Cossé agreed to pay for these costs.

BWA, Inc. also told Mr. Cossé that it wanted a signed contract. Mr. Cossé told the agency to send a contract to him and he would "get with Mr. Parrish and get it signed and get it back to [them]." BWA, Inc. prepared its standard, one-page agreement for Mr. Parrish's signature and gave it to Mr. Cossé on December 18, 1985, along with a statement for $11,838.85 for its media expenditures.

Mr. Parrish signed the contract on December 18, 1985, even though he questioned the meaning of some of its language. Mr. Cossé mailed the signed contract back to BWA, Inc. on December 20, 1985, and BWA, Inc.'s president signed it shortly thereafter.

The contract Mr. Parrish signed on December 18, 1985, states as follows:

**BWA** ———————— Bill Walker and Associates, Inc. ——

AGREEMENT

Mark Parrish/DBA PARCO Enterprises, (hereinafter called "Client") desires
to contract for the services of BWA, INC., Nashville, Tennessee 37212,
(hereinafter called "Agency") and agrees to engage the "Agency" for the
purpose of Marketing services that the "Client" may require.

THE PARTIES HEREBY AGREE AS FOLLOWS:

1) The "Client" agrees to retain the "Agency" on a service basis that
the "Agency" earn the standard agency commission of 15% net from
media.

2) The "Agency" agrees to submit plans and projections including cost
for placement of time/space, radio/television production, newspaper
ads and/or other printed materials for the approval of client or
person appointed to handle the marketing with O.K. initials for
each project.

3) The "Client" agrees that all approved media contracts will be processed
and payments for same made directly to the "Agency". Approved media
will be bought and placed by "Agency" at regular rates.

4) The "Client" agrees to pay at rate sheet rates, upon approval, for
production charges (art, mechanicals, typesetting, copy, television
and radio production).

5) Payment of all-front money shall be made within three (3) days upon
presentment of statement with proper back-up identification. All
monies unpaid ten (10) days from date of statements are subject to
1.75% monthly service charge.

6) The term of this agreement is open, and shall be evaluated at the
end of the second month for renewal thereof and may be interrupted
at the end of any month with thirty (30) days notice.

The preceding six-part agreement shall constitute "Client's" contract
to employ the services of the "Agency" hereby to guarantee acceptance
both corporately and personally, and the "Agency's" agreement thereto
to perform as outlined.

MARK PARRISH/PARCO ENTERPRISES, INC.          BWA, INC.

_Mark A. Parrish_          _Julia Eggers_

Mark Parrish/President          Julia Eggers/President

Dated this  December 18 ,1985.
1225 Seventeenth Avenue S. • Nashville TN 37212 • 615 329-1991

---

BWA, Inc. continued to perform in ac-
cordance with the agreement after the con-
tract was signed. In late December, 1985,
Mr. Parrish and Mr. Cossé cancelled the
Lubbock concert, and BWA, Inc. was re-
quired to work over the New Year's holi-
day to cancel radio spots and newspaper
advertising in order to obtain refunds of
the advertising fees it had already paid.

In January, 1986, BWA, Inc. sent Mr.
Cossé a bill for its services. It sent him a
revised bill in March, 1986. Mr. Cossé
agreed to all the charges in the revised bill

except for a $2,670 charge for the production of the advertising copy. BWA, Inc. hand delivered two "past due notices" to Mr. Parrish after he and Mr. Cossé declined to meet concerning the bill. Despite receiving these notices, Mr. Parrish refused to pay the bill or to acknowledge that he was responsible for its payment.

BWA, Inc. filed an action against Mr. Parrish personally in June, 1986. Mr. Parrish answered in July, 1986, asserting that he was not liable for the debt because he had signed the contract solely in his "representative capacity as President of Pioneer American Realty Company, Inc."

On August 25, 1986, Pioneer American filed a Chapter 7 petition in the United States Bankruptcy Court for the Middle District of Tennessee. Among the approximately $425,000 in debts it sought to discharge was its $17,089.92 unsecured debt to BWA, Inc. While the bankruptcy proceeding was pending, the trial court heard the evidence concerning BWA, Inc.'s claim against Mr. Parrish and, on May 17, 1988, entered an order awarding BWA, Inc. a $23,728.97 judgment against Mr. Parrish personally.

## II.

■ We turn first to Mr. Parrish's argument that the trial court did not have "subject matter" jurisdiction over the lawsuit against him. Citing 28 U.S.C. § 1471 (repealed 1984),[1] he insists that once Pioneer American's bankruptcy petition was filed, the federal courts acquired "original and exclusive jurisdiction" over BWA, Inc.'s suit against him because BWA, Inc.'s claim had a "logical connection" with the corporate bankruptcy proceeding. We disagree. This argument is based upon a fundamental misunderstanding of the relationship between state courts and federal bankruptcy courts. The filing of a corporate bankruptcy petition does not automatically divest a state court of jurisdiction over state law claims against a corporate officer.

The federal courts have original and exclusive jurisdiction over Title 11 cases—those cases seeking relief under the Bankruptcy Code. *See* 28 U.S.C. § 1334(a); 1 *Collier on Bankruptcy* ¶ 3.01[1][c][i] (15th ed. 1988). They also have jurisdiction to hear other civil cases "related to" Title 11 cases, but according to 28 U.S.C. § 1334(b), this jurisdiction is not exclusive. 1 *Collier on Bankruptcy* ¶ 3.01[1][c][iv] (15th ed. 1988). Nothing in 28 U.S.C. § 1334 prevents a state court from adjudicating a related state law claim unless the federal courts elect to assert their jurisdiction over it.

The record does not indicate that the federal courts were ever requested to take jurisdiction over BWA, Inc.'s claim against Mr. Parrish or that any attempt was made to invoke the Bankruptcy Code's automatic stay provisions. The absence of this proof is easily understood. Both avenues of relief were inapplicable to BWA, Inc.'s claim.

■ The Bankruptcy Code's automatic stay provisions apply only to state court proceedings seeking to obtain property that is part of the debtor's estate in bankruptcy. *In re Nashville Album Prods., Inc.*, 33 B.R. 123, 124 (M.D.Tenn.1983). BWA, Inc.'s action was not against the corporate debtor in the bankruptcy proceeding. It was against an officer of the debtor. It did not seek the corporate debtor's estate, but rather it sought a recovery from the officer's personal funds.

Similarly, the federal courts customarily decline to assert jurisdiction over a creditor's claims against a party other than the debtor when the claim will not have a significant impact on the bankruptcy proceeding. *In re Rustic Mfg., Inc.*, 55 B.R. 25, 29–30 (W.D.Wis.1985); *In re Otero Mills, Inc.*, 21 B.R. 777, 778 (D.N.M.1982).

The mandatory abstention provisions in 28 U.S.C. § 1334(c)(2) would result in the federal courts' declining to assert jurisdiction over BWA, Inc.'s claim against Mr. Parrish because (1) it is based on state law, (2) the suit had already been commenced

---

1. 28 U.S.C. § 1471 (1982) was repealed in 1984 and replaced by 28 U.S.C. § 1334 (Supp. III 1985).

and could be resolved in state court, and (3) the claim could not provide the federal courts with an independent basis to assert jurisdiction. *National Acceptance Co. of California v. Levin,* 75 B.R. 457, 459 (D.Ariz.1987).

The trial court's subject matter jurisdiction derives from state law and from the Tennessee Constitution. *Brown v. Brown,* 198 Tenn. 600, 618–19, 281 S.W.2d 492, 501 (1955); *Fentress v. Fentress,* 54 Tenn. (7 Heisk.) 428, 433 (1872). Tenn.Code Ann. § 16–11–102(a) (1980)[2] gives the trial court jurisdiction over breach of contract cases. In the absence of proof that the federal courts hearing Pioneer American's bankruptcy petition sought to exercise jurisdiction over BWA, Inc.'s claim against Mr. Parrish, we find that the trial court had jurisdiction over the suit against Mr. Parrish.

### III.

The trial court found that Mr. Parrish was personally liable under the December 18, 1985 contract because the corporate entity named in the contract, "PARCO Enterprises, Inc.", did not exist. This reasoning is incorrect.

At all times relevant to the transaction between the parties, Tennessee law permitted corporations to use a fictitious or assumed name in addition to the name appearing on its corporate charter.[3] *Life & Casualty Ins. Co. v. City of Nashville,* 175 Tenn. 688, 693, 137 S.W.2d 287, 289 (1940); *Precious Blood Soc'y v. Elsythe,* 102 Tenn. 40, 45, 50 S.W. 759, 760 (1899); *Louisville, N. & Great S. R.R. v. Reidmond,* 79 Tenn. 205, 206 (1883); *Bank of Tennessee v. Burke,* 41 Tenn. (1 Cold.) 623, 625 (1860).

Accordingly, a corporation was permitted to enter into a contract using its assumed name without affecting the validity of the contract. The contract was enforceable by either contracting party, as long as the identity of the corporation could be established. *See* 6 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 2442.1 (rev. perm. ed. 1979); H. Ballentine, *Ballentine on Corporations* § 117 (rev. ed. 1946); 18A Am.Jur.2d *Corporations* § 284 (1985); 18 C.J.S. *Corporations* § 166 (1939).

There is little question that "PARCO", "PARCO Enterprises", and "PARCO ENTERPRISES, INC." were the assumed or fictitious names used to identify Pioneer American. Mr. Parrish, Mr. Cossé, and BWA, Inc.'s employees customarily referred to the corporation as "Parco." BWA, Inc. used the name "Parco" on its account records and in its standard agency contract.

By using the name "Parco" and its derivatives, the parties intended to bind Pioneer American. For the purposes of resolving the present dispute, no legal significance should be attached to the difference between the name Pioneer American used in its corporate charter and the name or names it used to transact its business with BWA, Inc. Thus, if Mr. Parrish is to be found personally liable under the December, 1985 contract, it must be for reasons different from those relied upon by the trial court.

### IV.

Our task is to ascertain and to give effect to the contracting parties' intentions, *Bob Pearsall Motors, Inc. v. Regal Chrysler–Plymouth, Inc.,* 521 S.W.2d 578, 580 (Tenn.1975), by considering the entire agreement without favoring either party. *Cocke County Bd. of Highway Commrs. v. Newport Utils. Bd.,* 690 S.W.2d 231, 237 (Tenn.1985); *APAC–Tennessee, Inc. v. J.M. Humphries Constr. Co.,* 732 S.W.2d 601,

---

**2.** Tenn.Code Ann. § 16–11–102(a) provides, in part that "[t]he chancery court has concurrent jurisdiction, with the circuit court, of all civil causes of action, triable in the circuit court ..."

**3.** The use of an assumed or fictitious trade name has always been subject to the laws regarding unfair competition and the protection of trade names. *See* Tenn.Code Ann.

§ 48–14–101(h) (1988); Tenn.Code Ann. § 48–1–207(d) (repealed 1988). Unlike the law prior to 1988, the new Tennessee Business Corporations Act requires that corporations must file an application for permission to use an assumed name. *See* Tenn.Code Ann. § 48–14–101(d).

604 (Tenn.Ct.App.1986); *Taylor v. White Stores, Inc.,* 707 S.W.2d 514, 516 (Tenn.Ct. App.1985).

The law imputes to contracting parties an intention corresponding to the reasonable meaning of their words and acts. *Sutton v. First Nat'l Bank of Crossville,* 620 S.W.2d 526, 530 (Tenn.Ct.App.1981). Thus, we construe a contract's language using its ordinary and customary meaning. *Evco Corp. v. Ross,* 528 S.W.2d 20, 23 (Tenn. 1975).

◼ We are not concerned with the parties' state of mind when they entered into the contract, *Petty v. Sloan,* 197 Tenn. 630, 642, 277 S.W.2d 355, 360–61 (1955), and, therefore, we do not consider their uncommunicated, subjective intentions. *Malone & Hyde Food Servs. v. Parson,* 642 S.W.2d 157, 159 (Tenn.Ct.App.1982); *Ward v. Berry & Assocs., Inc.,* 614 S.W.2d 372, 375 (Tenn.Ct.App.1981). As noted by Judge Learned Hand:

> A contract is an obligation attached by mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes on them, he would still be held, unless there was some mutual mistake, or something else of the sort.

*Hotchkiss v. National City Bank of New York,* 200 F. 287, 293 (S.D.N.Y.1911). *See also* Restatement (Second) of Contracts § 19 (1979).

Three portions of the December, 1985 agreement convey an intent to obligate Mr. Parrish in addition to Pioneer American. The designation of the client as "Mark Parrish/DBA PARCO Enterprises" indicates that a single entity, Mark Parrish, is doing business under the name of "PARCO Enterprises" and is agreeing to be bound by the contract.[4] The concluding paragraph of the agreement states that the client "contract[s] ... to guarantee acceptance both corporately and personally." Fi-

nally, Mr. Parrish's name precedes his signature, thereby implying that he signed the contract both as an individual and as a representative of his corporation.

◼ A corporate officer's signature, preceded by the corporation's name and followed by words denoting the officer's representative capacity, binds only the corporation. *Anderson v. Davis,* 34 Tenn. App. 116, 120, 234 S.W.2d 368, 369–70 (1950); *Wilson v. Fite,* 46 S.W. 1056, 1057 (Tenn.Ch.App.1897). *See also* Tenn.Code Ann. § 47–3–403(3) (1979). However, Mr. Parrish cannot take refuge behind this principle because his signature is preceded by his own name in addition to his corporation's assumed name.

The use of "MARK PARRISH/PARCO ENTERPRISES, INC." prior to his signature can be viewed as an indication that Mr. Parrish intended to sign the contract as an individual and as a representative of his corporation. Thus, the inclusion of his corporate title following his signature does not necessarily indicate that he signed the contract only in his representative capacity.

◼ Whether a person signing a contract intended to do so as an individual or as the representative of another should, where possible, be determined from the contract's language. *Lazarov v. Klyce,* 195 Tenn. 27, 34, 255 S.W.2d 11, 14 (1953). The agreement before us shows that Mr. Parrish signed the contract both as an individual and as a representative of Pioneer American. This conclusion is consistent with Mr. Cossé's statement to BWA, Inc. that "you're looking at Mr. Parrish, he's the man with the pocketbook."

### V.

Finally, Mr. Parrish makes the any-port-in-the-storm argument that there was no consideration for the contract. He insists that the contract obligated him to pay for only the services performed after he signed the agreement and that "[t]here was no evidence that anything done by plaintiff under this alleged contract after its execution." We disagree with Mr. Parrish's

---

4. *See Duval v. Midwest Auto City, Inc.,* 425 F.Supp. 1381, 1387 (D.Neb.1977).

view of the proof and with his interpretation of the contract.

 A contract is simply an agreement between two parties, based on adequate consideration, to do or not to do a particular thing. *Johnson v. Central Nat'l Ins. Co. of Omaha,* 210 Tenn. 24, 34, 356 S.W. 2d 277, 281 (1962). The agreement need not be in writing unless required by law, and mutual promises between the contracting parties are adequate consideration. *Rodgers v. Southern Newspapers, Inc.,* 214 Tenn. 335, 342, 379 S.W.2d 797, 800 (1964).

The parties' contract consists of two bilateral agreements. The first agreement consists of BWA, Inc.'s promise to provide public relations services for the Texas tour in return for the promoters' promise to pay for the services. The second agreement consists of BWA, Inc.'s agreement to pay for the advertising space in return for the promoters' promise to reimburse them for these costs. The parties' mutual promises were adequate consideration when the agreements were made, and they also gave rise to the promoters' enforceable obligation to pay for the services once they were performed.

The agreement Mr. Parrish signed on December 18, 1985 merely embodied the agreement that had already been made in November, 1985. Notwithstanding Mr. Parrish's self-serving denials at trial, the proof points inescapably to the conclusion that Mr. Cossé was acting on behalf of both Pioneer American and Mr. Parrish when he promised to pay for BWA, Inc.'s services. There is an abundance of proof that BWA, Inc. performed services both before and after December 18, 1985. Thus, there is adequate consideration to support Mr. Parrish's contractual obligations.

### VI.

The trial court's judgment is affirmed and the case is remanded for whatever further proceedings may be required. The costs of the appeal are taxed in equal proportions to Bill Walker & Associates, Inc. and to Mark Parrish and to their respective

sureties for which execution, if necessary, may issue.

TODD, P.J., and CANTRELL, J., concur.