In re DORROUGH, PARKS & COMPANY, Debtor.

Ann MOSTOLLER, Trustee, Plaintiff,

v.

ASPEN MARINE GROUP, Union Planters National Bank, First American National Bank, and The United States of America, Defendants.

Bankruptcy No. 92–32091.
Adv. No. 92–3213.

United States Bankruptcy Court, E.D. Tennessee.

Oct. 20, 1994.

Ann Mostoller, Trustee, Oak Ridge, TN.

Hunton & Williams, John A. Lucas, Martin B. Bailey, Knoxville, TN, for defendant First American Nat. Bank.

Bernstein, Stair & McAdams, Doris C. Allen, Knoxville, TN, for defendant Union Planters Nat. Bank.

Carl K. Kirkpatrick, U.S. Atty., Knoxville, TN, Carol Priest, U.S. Dept. of Justice, Tax Div., Washington, DC, for U.S. and its agency, I.R.S.

## MEMORANDUM ON PRIORITY OF LIEN OF DEFENDANTS UNITED STATES OF AMERICA AND UNION PLANTERS NATIONAL BANK

RICHARD S. STAIR, Jr., Bankruptcy Judge.

An involuntary case was commenced against the debtor, Dorrough, Parks & Company, on April 27, 1992, and an order for relief was granted under Chapter 7 on June 18, 1992. This adversary proceeding was the subject of a previous memorandum opinion and order filed on November 4, 1993, resolving summary judgment motions filed by two defendants, Union Planters National Bank (Union Planters) and First American National Bank (First American). Although the only issue remaining before the court is the relative priority of the Internal Revenue Service (IRS) and Union Planters to certain funds originally held in the debtor's bank account or presently owing the trustee, a review of the prior history of this proceeding is necessary.

The trustee brought this adversary proceeding alleging that between the filing of the involuntary petition and the entry of the order for relief, Steven Dorrough, then the managing partner of the debtor, on behalf of the debtor, settled a $285,000 account receivable for professional fees owed to the debtor by the defendant, Aspen Marine Group (Aspen Marine).[1] Specifically, the trustee alleged that Mr. Dorrough collected only $250,000 of the receivable and forgave the balance. Of the amount collected, a significant portion, approximately $235,603, remains subject to resolution of the Union Planters–IRS lien priority issue raised by the trustee's Complaint.

The trustee alleged that the entire $285,000 receivable was a matured debt owed to the debtor, payable on demand. By her Complaint, she sought a turnover pursuant to Bankruptcy Code § 542 of the unpaid $35,000. Alternatively, she contended that the fee reduction was a postpetition transfer avoidable under Bankruptcy Code § 549. The trustee further sought avoidance of the IRS's statutory lien pursuant to Bankruptcy Code § 545, and a determination of the nature, extent, and priority of the liens asserted by the defendants, excluding Aspen Marine, pursuant to Fed.R.Bankr.P. 7001(2).[2]

Originally, the defendants, First American and Union Planters, both asserted competing security interests in all or a portion of the funds.[3] The IRS also asserted a statutory tax lien against the same funds.

The trustee obtained a judgment against Aspen Marine on her turnover and avoidance cause of action on July 29, 1994. Aspen Marine did not appear at the trial and a judgment was entered against it in the amount of $50,045.86.[4] Further, the issues regarding First American's priority have been resolved. The only remaining issue is the relative priority between the IRS and Union Planters over the disputed funds. The parties have submitted this issue for judgment on stipulations and exhibits.

This is a core proceeding. 28 U.S.C.A. § 157(b)(2)(K) (West 1993).

---

1. Aspen Marine was formally known as Aspen Wind, Inc., until its name was legally changed in March 1992. Marine Sports, Inc. was a subsidiary of what is currently known as Aspen Marine until the two entities merged through a reverse acquisition. The disputed funds were received by the debtor for its work on a public offering associated with the reverse acquisition. For purposes of this Memorandum, the court makes no distinction between Aspen Wind, Inc. and Aspen Marine and will refer to the entities exclusively as Aspen Marine.

2. The trustee has apparently abandoned her § 545 avoidance action against the IRS as this issue was not identified in the Pretrial Order entered on May 6, 1994. At any rate, it is rendered moot by the court's resolution in this memorandum of the priority dispute between the IRS and Union Planters.

3. An Order of Substitution entered on July 19, 1993, substituted Union Planters in place of Bank of East Tennessee, an original defendant against whom the trustee filed her Complaint. All references in this Memorandum to transactions involving Union Planters, in fact, were transactions with Bank of East Tennessee.

4. In presenting her proof, the trustee established that the actual amount owed the debtor by Aspen Marine was $50,045.86 rather than $35,000. She was permitted to amend her Complaint pursuant to Fed.R.Civ.P. 15(b) to conform to the evidence.

**I**

Union Planters filed a proof of claim on October 14, 1992, which indicates a total indebtedness of $1,061,323.96. The indebtedness relates to three notes executed by the debtor: one in the original principal amount of $135,000 executed on December 5, 1988, one in the original principal amount of $300,-000 executed on February 17, 1989, and one in the original principal amount of $250,000 executed on April 26, 1991. These notes are all secured according to a security agreement entered into contemporaneously with the December 5, 1988 note. Pursuant to the security agreement, the debt is secured by, among other things, contract rights and accounts receivable, both existing and after acquired, and also proceeds of contract rights and accounts receivable. It is undisputed that the security interest was properly perfected.

On February 14, 1992, the IRS filed a Notice of Federal Tax Lien asserting a lien in the amount of $64,704.32 plus interest on all property of the debtor. Union Planters seeks a determination that the IRS's lien on the funds held in the bank account is inferior to its perfected security interest.

■ The nature of Union Planters' security interest has been characterized as a floating lien. *See generally* Barkley Clark, *The Law of Secured Transactions Under the Uniform Commercial Code* ¶ 10.01 (rev. ed. 1993 & Supp.1994). It allows a lender to maintain a security interest in property of a revolving nature, such as inventory, accounts, and cash collected on accounts.

Federal tax liens are created and operate under a framework provided by Internal Revenue Code (IRC) §§ 6321 to 6327. IRC § 6323(c) provides in material part:

(c) **Protection for certain commercial transactions financing agreements, etc.—**

(1) **In general.—**To the extent provided in this subsection, even though notice of a lien imposed by section 6321 has been filed, such lien shall not be valid with respect to a security interest which came

into existence after tax lien filing but which—

(A) is in qualified property covered by the terms of a written agreement entered into before tax lien filing and constituting—

(i) a commercial transactions financing agreement, [and]

. . . .

(B) is protected under local law against a judgment lien arising, as of the time of tax lien filing, out of an unsecured obligation.[5]

(2) **Commercial transactions financing agreement.—**For purposes of this subsection—

(A) **Definition.—**The term "commercial transactions financing agreement" means an agreement (entered into by a person in the course of his trade or business)—

(i) to make loans to the taxpayer to be secured by commercial financing security acquired by the taxpayer in the ordinary course of his trade or business, or

(ii) to purchase commercial financing security (other than inventory) acquired by the taxpayer in the ordinary course of his trade or business;

but such an agreement shall be treated as coming within the term only to the extent that such loan or purchase is made before the 46th day after the date of tax lien filing or (if earlier) before the lender or purchaser had actual notice or knowledge of such tax lien filing.

(B) **Limitation on qualified property.—**The term "qualified property", when used with respect to a commercial transactions financing agreement, includes only commercial financing security acquired by the taxpayer before the 46th day after the date of tax lien filing.

(C) **Commercial financing security defined.—**The term "commercial financing security" means (i) paper of a kind

---

5. The applicable local law is Tennessee's version of Article 9 of the Uniform Commercial Code. Union Planters' secured interest would be protected from a judgment lien pursuant to Tenn. Code Ann. §§ 47–9–201, –301, –306 (1992). *See also* Clark, *supra,* ¶ 10.06.

ordinarily arising in commercial transactions, (ii) accounts receivable. . . .

26 U.S.C.A. § 6323(c) (West Supp.1994).

▮ In sum, collateral that constitutes qualified property acquired by a borrower within forty-five days after the filing of a federal tax lien is protected from the tax lien. *See State Bank of Fraser v. United States,* 861 F.2d 954, 963–65 (6th Cir.1988). Although IRC § 6323(c) does not expressly indicate whether security interests in contract rights or proceeds of qualified property are protected, the federal regulations make it clear that both contract rights and proceeds fit within the definition of qualified property. 26 C.F.R. § 301.6323(c)–1(c)(1) & (d) (1994); *see In re National Fin. Alternatives, Inc.,* 96 B.R. 844, 851 (Bankr.N.D.Ill.1989). The party asserting priority over a federal tax lien has the burden of proving that its security interest is protected under IRC § 6323(c). *See Resolution Trust Corp. v. Gill,* 960 F.2d 336 (3d Cir.1992).

Union Planters acknowledges that the funds held in the debtor's bank account were received by the debtor outside the forty-five day period after the tax lien was filed. It contends, however, that Aspen Marine made the payment in return for services performed by the debtor pursuant to an oral contract. Therefore, the payment was a proceed of the debtor's contract rights in which it held a perfected security interest. Union Planters further contends that because the contract rights were qualified properties, the proceeds are also exempt from the federal tax lien pursuant to IRC § 6323(c).

The IRS acknowledges that if the disputed funds were received by the debtor as payment for work performed under a pre-existing contract, Union Planters' security interest will prevail over its tax lien. However,

the IRS contends that the work performed by the debtor, for which it received the disputed funds, was not performed pursuant to a contract.[6] It argues that if no pre-existing enforceable contract exists, the secured creditor's interest attached when the work was performed. It contends, therefore, that Union Planters' security interest prevails over its tax lien only as to payment received for work performed within forty-five days after the tax lien was filed.

Union Planters' previous summary judgment motion was denied because it was impossible to discern from the record whether the debtor was performing services pursuant to a pre-existing contract. Union Planters and the IRS have submitted stipulations, exhibits, and deposition transcripts to supplement the record and to allow the court to address the remaining issues of: (1) whether the payment received by the debtor was for work performed under a pre-existing contract; and (2) if not, then what portion of the payment was for work performed within forty-five days of the filing of the tax lien?

## II

▮ Aspen Marine hired the debtor accounting firm to conduct transactional work for its proposed public offering of stock. Prior to this engagement, the debtor had performed routine accounting services for Marine Sports, a subsidiary of Aspen Marine. Steven Dorrough, a principal in the debtor firm, held the initial discussions that led to the subject engagement. Ella Boutwell Chesnutt ultimately negotiated the final price for the public offering work, but was not involved in the hiring of the debtor.[7]

When Aspen Marine hired the debtor in February or March 1991, the debtor merely agreed to perform the transactional work

---

6. Although the statute of frauds under Tenn.Code Ann. § 29–2–101 (Supp.1994) is arguably a defense in this case, the IRS has never asserted it; and therefore, the court deems the defense waived. *See* Fed.R.Civ.P. 8(c); *TCP Indus., Inc. v. Uniroyal, Inc.,* 661 F.2d 542, 547 (6th Cir. 1981) (Statute of frauds "is waived if not raised as a defense in the pleadings."). Therefore, the IRS's only defense is that the debtor's performance of the public offering work for Aspen Marine was not pursuant to a contract.

7. Ms. Chesnutt joined Aspen Marine as the Director of Legal Affairs after the debtor was hired to work on the public offering. Prior to joining Aspen Marine, she was employed by Marine Sports. She could not testify about the routine accounting work that the debtor performed for Marine Sports and could only speculate about the substance of the parties' initial discussions that occurred when the debtor was hired for the public offering work.

required for the public offering. The parties never agreed to a specific hourly or monthly rate, and left the final price open in accordance with the customary practice of determining the price at the close of the transaction. However, Steven Dorrough eventually agreed to cap his rate at $15,000 per month.

In Tennessee, " '[a] contract is simply an agreement between two parties, based on adequate consideration, to do or not to do a particular thing.' " *Newton v. Gibalski (In re Gatlinburg Motel Enters.)*, 127 B.R. 814, 817 (Bankr.E.D.Tenn.1991) (quoting *Bill Walker & Assocs., Inc. v. Parrish*, 770 S.W.2d 764, 771 (Tenn.Ct.App.), *perm. to appeal denied, id.* at 764 (Tenn.1989)). The contract "may be either expressed or implied, or written or oral"; however, "it must result from a meeting of the minds of the parties in mutual assent to the terms," and it must be "sufficiently definite to be enforced." *Johnson v. Central Nat'l Ins. Co.*, 210 Tenn. 24, 356 S.W.2d 277, 281 (1962); *see Bill Walker & Assocs.*, 770 S.W.2d at 770–71. In determining whether a meeting of the minds occurred and a contract exists, Tennessee courts consider the words used by the parties, and in cases of doubt, " 'the situation, acts, and the conduct of the parties, and the attendant circumstances.' " *APCO Amusement Co. v. Wilkins Family Restaurants of Am., Inc.*, 673 S.W.2d 523, 527 (Tenn.Ct. App.) (quoting 17 Am.Jur.2d Contracts § 1 (1964)), *perm. to appeal denied, id.* at 523 (Tenn.1984). Courts also consider whether the parties acted "in such a way as to suggest that they believed a binding agreement had been reached." *Id.* at 527; *see Bailey v. Brister*, 49 Tenn.App. 191, 353 S.W.2d 564, 568 (1961), *cert. denied, id.* at 564 (Tenn. 1962).

The parties have presented the depositions of Steven Dorrough and Ella Boutwell Chesnutt as evidence of the debtor's oral agreement with Aspen Marine, the debtor's and Aspen Marine's conduct throughout the engagement, and the attendant circumstances. Steven Dorrough testified that he and Aspen Marine discussed fees when the debtor was hired to perform the public offering work.

(Dorrough Dep. at 26–27.) Although he did not "recall the specific conversation" with Aspen Marine, he "[t]ypically ... would charge on a per diem basis, and at such time that the transaction closed there would be an evaluation as to ... the benefit derived to the client, the time that was spent, because in dealing with the SEC, you never know—they are always unknown." (*Id.* at 27.) He further testified that for transactional work, he would always "sit down with the client, go through the work-in-process billing, [*i.e.*, an itemized bill,] come upon a figure that was reasonable and come upon a price that was fair for the services rendered." (*Id.* at 20.)

As to the customary practices between Aspen Marine and the debtor, Mr. Dorrough testified,

> [T]his relationship with Supra Marine Sports [now Aspen Marine] goes back to 1984, and the way that the relationship was with the client, it was very much an open and candid relationship. If I felt like the bill was too small and the benefits they derived were great, then I wasn't shy about sharing that request with them.
>
> And in the alternative, if we had had some people working on the job that were perhaps not ... as experienced in the process, then ... that needed to be taken into consideration.... [T]hese things ... really are [a] normal course of business....

(*Id.* at 27–28.)

Based on Mr. Dorrough's testimony, there was a meeting of the minds when Aspen Marine hired the debtor: the debtor would provide accounting services to Aspen Marine and Aspen Marine would pay a reasonable fee, determinable at the end of the project, to the debtor. This was the customary practice between the parties.

Ultimately Mr. Dorrough capped the bill at $15,000 per month because "it got to the point that it was such a difficult transaction," and the bill was getting "a little stout for a small cap public company," especially when the accounting services needed to complete the public offering were compared to the proceeds to be received from the offering.[8]

---

8. The parties were unable to determine exactly when the bill was capped; however, according to

Mr. Dorrough's testimony the bill was capped "in the last several months" of the public offer-

(*Id.* at 19, 21.) Mr. Dorrough further testified that the cap "was more of an adjustment that [he] made to be reasonable." (*Id.* at 45.) Thus, the parties' actions during the project were in accordance with the existence of an agreement that Aspen Marine would only pay a reasonable fee, *i.e.,* a fee commensurate with the work performed and the benefit received.

The court rejects the IRS's contention that Ella Chesnutt's testimony is inconsistent with Mr. Dorrough's testimony. Ms. Chesnutt was not involved in the hiring of the debtor and could only speculate as to the parties' oral agreement; however, she was able to testify as to the parties' conduct after the debtor was hired and the parties' customary practices. She clarified Steven Dorrough's testimony when she stated during her deposition that a fee "of some amount" would have been paid to the debtor if the public offering had failed. (Chesnutt Dep. at 26.) Thus, Aspen Marine agreed to pay a reasonable fee, *i.e.,* a fee commensurate with the work performed and the benefit received, not a contingency fee.

She further testified that the customary practice in public offering transactions is for the accountant's fee to be negotiated after the work is completed "because no one can envision the amount of work or the extensiveness ... involved in" the project when it begins. (*Id.* at 28.) She characterized the debtor's work-in-process bill "[a]s an estimation of what he believed to be a fee that he would like to receive for the transaction," (*id.* at 37), and she testified that she "looked at what the amount was" to help her determine what constituted "a reasonable fee for the work that was rendered," (*id.* at 35). The final price was then negotiated because "that's the way the transactions are done." (*Id.* at 37–38.) Obviously, there was a meeting of the minds when Aspen Marine hired the debtor: the debtor would provide accounting services to Aspen Marine and Aspen Marine would pay a reasonable fee, determinable at the end of the project, to the debtor.

 Nonetheless, the IRS asserts that the public offering work was not performed pursuant to a contract because the relationship between the debtor and Aspen Marine was at will and the debtor would not have had a breach of contract action against Aspen Marine. Tennessee courts hold that a contract need not specify a duration, and in such case, a court can construe the contract as either " 'perpetual or terminable at will.' " [9] *APCO Amusement Co.,* 673 S.W.2d at 528 (quoting 17 Am.Jur.2d Contracts § 80 (1964)); *see First Flight Assocs. v. Professional Golf Co.,* 527 F.2d 931, 935 (6th Cir. 1975). However, the court is not required to determine the duration of the contract between the debtor and Aspen Marine. The parties entered a contract with a finite duration: the debtor was to perform the public offering work, and once the public offering was completed, the contract ended. If the debtor had delayed its performance of the transactional work or discontinued performing the work before the project was complete, Aspen Marine could have asserted a breach of contract claim against the debtor for damages caused by its failure to fully and timely perform the contract. Conversely, if Aspen Marine had attempted to terminate the relationship, it could have been required to pay damages to the debtor.

The IRS also asserts that according to *In re May Reporting Services, Inc.,* 115 B.R.

---

ing project that was ultimately completed in May 1992. (Dorrough Dep. at 47.)

**9.** The contract is also enforceable despite the lack of a price term, although Tennessee courts generally hold that an enforceable contract must contain certain essential terms, including a price. *See, e.g., Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n,* 807 S.W.2d 559, 565 (Tenn. Ct.App.1990) (lack of essential term might make contract unenforceable due to indefiniteness), *perm. to appeal denied, id.* at 559 (Tenn.1991). Here, the parties specified a price in their contract when they agreed that a reasonable fee would be paid. *See Miller v. Washington County,* 143 Tenn. 488, 226 S.W. 199, 203 (1920) (enforcing contract containing a "reasonable fee" price provision); *Fulton v. Tennessee Walking Horse Breeders' Ass'n of Am.,* 63 Tenn.App. 569, 476 S.W.2d 644, 652 (1971) (enforcing employment contract lacking a price provision and recognizing rebuttable presumption that where no compensation amount is specified, the employer must pay for the employee's services at the rate being paid when the contract was executed), *cert. denied, id.* 476 S.W.2d at 644 (1972).

**142**

652 (Bankr.D.S.D.1990), no contract existed between the debtor and Aspen Marine. The *In re May* court was required to decide whether the debtor performed court reporting services pursuant to contracts in determining whether a tax lien took priority over a consensual lien granted by the debtor in assets such as accounts receivable. *Id.* at 654. The court held that "[n]o evidence admitted established May entered into any definite contracts" to provide court reporting services. *Id.* at 660. Instead, clients called May on a sporadic basis and its "lengthy relationship with several clients is insufficient to prove binding enforceable contracts," especially because "[a]ny amounts under such informal agreements would be mere speculation, insufficient to set a specific dollar amount upon." *Id.*

Union Planters has presented evidence of the lengthy relationship between the debtor and Aspen Marine as well as evidence that the debtor agreed to perform extensive, technical, and specialized work for Aspen Marine's public offering in return for a reasonable fee. This contract was for one specific, difficult project,[10] as opposed to the alleged contracts in *In re May* that appeared to be blanket contracts for the life of the debtor's relationship with its clients. Furthermore, Steven Dorrough's and Ella Chesnutt's testimony of the parties' conduct and attendant circumstances support the existence of an oral contract. Similar evidence was apparently not provided to the *In re May* court.

Accordingly, the court concludes that the disputed funds were received by the debtor for work performed pursuant to an oral contract that was entered into in 1991 when the debtor agreed to perform the transactional work for Aspen Marine's public offering. Union Planters acquired a security interest in 1991 in the contract rights and subsequent proceeds arising from the debtor's oral contract; and thus, Union Planters' lien takes priority over the IRS's lien. A discussion of the second issue as to what portion of work was performed within forty-five days of the filing of the tax lien is unnecessary.

For the reasons set forth herein, a judgment will be entered that Union Planters' lien in the funds received by the debtor from Aspen Marine and in any funds recovered by the trustee from Aspen Marine is superior to the interest of the IRS and to the interest of the trustee.

### JUDGMENT

For the reasons set forth in the Memorandum on Priority of Liens of Defendants United States of America and Union Planters National Bank filed this date containing findings of fact and conclusions of law as required by Fed.R.Bankr.P. 7052, it is ORDERED, ADJUDGED, and DECREED that the lien of the defendant Union Planters National Bank is superior to the lien of the defendant, the United States of America, and to the interest of the plaintiff as trustee in bankruptcy for the debtor Dorrough, Parks & Company in: (1) those funds received by the debtor from the defendant Aspen Marine Group between April 27, 1992, the date of the commencement of the involuntary case against the debtor, and June 18, 1992, the date the order for relief was entered against the debtor under Chapter 7; and (2) any funds that may be recovered by the plaintiff from the defendant Aspen Marine Group pursuant to this adversary proceeding.

---

**10.** Mr. Dorrough testified that the public offering was "a very difficult transaction," and "the hard-est deal [he had] ever worked on." (Dorrough Dep. at 18, 41.)