IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 8, 2003 Session

## EDWARD RISHER v. CHEROKEE BUICK-PONTIAC-OLDSMOBILE-GMC TRUCK, LLC, ET AL.

**Appeal from the Chancery Court for Washington County**
**No. 33821      G. Richard Johnson, Chancellor**
**FILED JULY 28, 2003**

### No. E2002-1644-COA-R3-CV

Edward Risher ("Plaintiff") accepted employment with Cherokee Buick-Pontiac-Oldsmobile-GMC Truck, LLC, and Cherokee New Car Alternative, LLC ("Defendants"). There was no written contract between Plaintiff and Defendants. Plaintiff claims he was offered a salary of $75,000 annually plus commissions, and that he accepted this offer. Defendants never paid Plaintiff this amount. Plaintiff was fired after several months of work. Plaintiff sued for breach of contract, detrimental reliance, and violation of Tenn. Code Ann. § 50-1-102. The jury returned a verdict in Plaintiff's favor, and judgment was entered on this verdict. Defendants appeal. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed.**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and CHARLES D. SUSANO, JR., J., joined.

Jill R. Rayburn, Johnson City, Tennessee, for the Appellants, Cherokee Buick-Pontiac-Oldsmobile-GMC Truck, LLC and Cherokee New Car Alternative, LLC.

Rick J. Bearfield and Jason W. Blackburn, Johnson City, Tennessee, for the Appellee, Edward Risher.

## OPINION

### Background

In late 1999, Mike Simone, Defendants' general manager, and Plaintiff discussed the possibility of Plaintiff accepting employment as the general manager of a used car super center that Defendants planned to open in Johnson City, Tennessee. Walter Leipuner, the owner of Defendants,

testified that sometime after he and Mr. Simone talked to Plaintiff about Plaintiff's filling the position but before Plaintiff was hired, he and Mr. Simone "decided [they] weren't going to go that route and [they] didn't do anything about it for a couple of months." Plaintiff testified he never was informed of this change and believed he was hired to be the general manager of the used car super center. At the time Plaintiff and Mr. Simone first talked about Plaintiff's possible employment with Defendants, Plaintiff was working as the general sales manager for Grindstaff Kia and was earning $66,227 annually, which consisted of $1,500 per month in salary plus commissions on sales.

In early January of 2000, Plaintiff accepted Defendants' offer of employment. Plaintiff alleges the offer he accepted was for employment as the general manager of the used car super center at a salary of $75,000 per year plus 10% commissions on net profits. Plaintiff and Defendants had no written contract of employment. Plaintiff testified that he and Defendants had an oral contract that "was specifically for the year that was indicated in the salary." Plaintiff began to work for Defendants on January 18, 2000.

Plaintiff was in the process of refinancing his home when he accepted employment with Defendants. Plaintiff and his wife were refinancing in order to turn their thirty year mortgage into a fifteen year one, with slightly higher monthly payments. The lender sent a request for verification of employment form to Defendants because the lender required documentation to substantiate Plaintiff's future salary. Mr. Simone completed the form and signed it as general manager for Defendants. The form listed Plaintiff's position as general sales manager for Cherokee Buick in Rogersville. Plaintiff testified at trial that the form stated his gross base pay was "seventy-five thousand dollars ($75,000.00) annually, plus commissions."

Shortly after Plaintiff accepted employment with Defendants, Mr. Simone told Plaintiff that Defendants were "engaged in conversation" regarding buying a Daewoo franchise. Plaintiff testified that Mr. Simone told him "they would need a sales manager with import experience" and that Mr. Simone requested a copy of Plaintiff's resume that Defendants could forward to Daewoo.

Because the used car super center Plaintiff claims he was hired to manage had not been established when Plaintiff began his employment, Plaintiff worked in several different positions during his employment with Defendants. Based upon the $75,000 per year salary Plaintiff alleges the parties agreed to, Plaintiff expected his weekly paychecks to be approximately $1,442. Plaintiff's first paycheck, however, was for only $500.00. At trial, Plaintiff testified his monthly expenses when he accepted employment with Defendants were over $2,500 per month, an amount more than Plaintiff was paid by Defendants. Plaintiff complained to Mr. Simone, his immediate supervisor, regarding this pay discrepancy and testified that Mr. Simone told him that "they cut that check hastily." Plaintiff further testified Mr. Simone requested that Plaintiff stay calm and "everything will be taken care of." Plaintiff received a second check dated the same date as his first paycheck for $76.92. Plaintiff's paychecks continued to be in the amount of $576.92 through the end of April. Plaintiff complained to Mr. Simone several more times and testified he was told he should not worry because "whenever everything became profitable that they would catch up all the back pay. . . ." At

one point, Plaintiff suggested if Mr. Simone could not handle the problem perhaps Plaintiff should speak to Mr. Leipuner. When Plaintiff made this suggestion, he was instructed that there was a chain of command and that it was Mr. Simone's responsibility to communicate with Mr. Leipuner, not Plaintiff's. Plaintiff was told to "follow a chain of command."

On two occasions during his employment with Defendants, Plaintiff received bonus checks. In March 2000, Plaintiff received a bonus check for $1,000. Then in April 2000, Plaintiff received a bonus check for $2,000. Plaintiff testified he believed he received these checks as a result of his complaints to Mr. Simone regarding the money Plaintiff believed he was owed. Plaintiff stated he believed "Mike Simone was actually doing something to recoup the monies that was owed me because they came up with a little money here, a little money there and then at the end increased my salary."

At the end of April, Plaintiff told Mr. Simone he would no longer be able to continue working at the salary he was being paid. Plaintiff's salary then was increased to $923.08 in his May 5, 2000, paycheck. In addition, Plaintiff testified that when he spoke to Mr. Simone at that time, Plaintiff was reassured "the back pay that they owed me, will be coming forthwith."

Mr. Leipuner testified at trial and a portion of his deposition was read at trial. During his deposition, Mr. Leipuner testified that he had spoken to Mr. Simone one to two hours prior to the deposition but stated he could not recall much about the conversation including whether Mr. Simone had told him about discussions that Mr. Simone previously had with Plaintiff, whether Mr. Leipuner and Mr. Simone had reached an agreement regarding how Mr. Leipuner would testify, or whether Mr. Leipuner and Mr. Simone had reached an agreement about what the truth is. When asked why he could not recall details about a conversation that had occurred only one to two hours prior, Mr. Leipuner testified he could not remember because "this isn't the biggest thing I have in my life" and "[i]t's not a major issue to me." Mr. Leipuner also testified during deposition "I can terminate anybody for any reason whatsoever. . . . I don't have to have a reason to terminate anybody." Mr. Simone did not testify.

At trial, Mr. Leipuner testified he was the person who determined salaries within the company and was the only one within the company who could determine who was entitled to a bonus and when. Mr. Leipuner testified that he and Mr. Simone had discussed Plaintiff's salary originally and determined the amount together.

When questioned about sending Plaintiff's resume to the Daewoo people, Mr. Leipuner testified that when he applied for the Daewoo franchise he had to produce histories on himself, his partner, Mr. Simone, Plaintiff, and Defendants' service manager because Daewoo wanted to know who would be in management.

Mr. Leipuner testified that Mr. Simone did not have the authority to sign the verification of employment form that Mr. Simone had signed for Plaintiff's lender. Normally, such a form would go to the office manager for signature. However, Mr. Leipuner also testified that Mr.

Simone did have access to Plaintiff's salary information. When questioned about the $75,000 written on the verification of employment form, Mr. Leipuner testified that Plaintiff "could have earned that if he had done a good job." However, Mr. Leipuner testified Plaintiff's annual salary was "[a]bout twenty-five thousand dollars" and that Plaintiff was not guaranteed any kind of compensation over and above his base pay of $25,000. Evidence at trial showed Plaintiff never was paid based upon a salary of $25,000, but instead his paychecks would have totaled an annual salary of over $29,000.

Mr. Leipuner denied that Plaintiff ever complained to him about any discrepancy in his pay. Further, Mr. Leipuner testified that he was not aware Plaintiff claimed to have a contract for $75,000 plus commissions until this lawsuit was filed. Mr. Leipuner testified his door "is always open, and rarely closed," but that there was a chain of command. Regarding his open door policy, Mr. Leipuner testified "I'm the owner, I can do what I want there."

Plaintiff was fired in May of 2000, allegedly for violating a company policy by selling a car to his son without Mr. Leipuner's permission. Plaintiff testified he had Mr. Leipuner's permission and that Mr. Leipuner had suggested the sale. Mr. Leipuner testified he never signed off on the sale documents and, therefore, did not approve the sale. Mr. Leipuner also testified that the company policy is an unwritten one that was not posted anywhere in the dealership. Mr. Leipuner further testified Plaintiff was fired also because of his poor job performance. However, Mr. Leipuner admitted that he had given Plaintiff two bonuses during the time Plaintiff worked for him. Mr. Leipuner testified there is a difference between a commission and a bonus. He testified that a commission is an "exact amount" or a set percentage while "[a] bonus is something where the owner says, 'Hey, this guy's really working his tail off and is doing a great job and I'm going to throw him something extra.'"

Plaintiff sued Defendants for breach of contract, detrimental reliance, and violation of Tenn. Code Ann. § 50-1-102. During discovery, Plaintiff requested Defendants provide information regarding their financial condition for each month for the period of January 18, 2000, to January 17, 2001. On the day of trial, Defendants produced the requested documentation, but only for the first four months of 2000, and only for Cherokee New Car Alternative, LLC. Defendants produced nothing for Cherokee Buick-Pontiac-Oldsmobile-GMC Truck, LLC. As a result of Defendants' failure to comply with discovery requests, the Trial Court refused to allow Defendants to produce evidence at trial that showed Defendants incurred losses in late 2000. Defendants claimed these losses offset the profits earned in early 2000. The Trial Court allowed Plaintiff to use the figures produced to come up with Defendants' net profit for that time period and then allowed Plaintiff to request that the jury multiply the total by three to determine the net profit for the entire year 2000. A portion of Plaintiff's claimed damages was based on Defendants' net profit for the year 2000.

Trial began in March of 2002. The jury returned a verdict in Plaintiff's favor finding that the parties had a contract; Defendants breached the contract; Plaintiff relied to his detriment on the representations made by Defendants regarding Plaintiff's employment; and that Defendants

induced, influenced, persuaded, or engaged Plaintiff to quit his former employment by means of false or deceptive representations concerning the amount and character of pay or compensation that Plaintiff would receive as Defendants' employee. Plaintiff presented evidence showing damages in the amount of $103,224.48, which broke down to $35,653.71 in salary and $67,570.77 in commission on net profits. The jury awarded Plaintiff damages in the amount of $55,000. The Trial Court entered its judgment based upon the jury verdict awarding Plaintiff judgment against the Defendants for $55,000 plus interest from January 17, 2001, at the rate of ten percent per annum until paid. The Trial Court denied Defendants' Motion for a New Trial and/or Motion to Alter or Amend Judgment Notwithstanding the Verdict. Defendants appeal.

## Discussion

Although not stated exactly as such, Defendants raise several issues on appeal: 1) whether there was material evidence to support the jury's verdict that a contract existed between Defendants and Plaintiff and that Defendants breached that contract; 2) whether there was material evidence to support the jury's verdict that there was detrimental reliance; 3) whether there was material evidence to support the jury's verdict that Defendants violated Tenn. Code Ann. § 50-1-102; 4) whether there was material evidence to support the amount of damages awarded to Plaintiff; and 5) whether the Trial Court abused its discretion in awarding pre-judgment interest. We will address each issue in turn.

"Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." Tenn. R. App. P. 13(d). As our Supreme Court has explained:

It is the time honored rule in this State that in reviewing a judgment based upon a jury verdict the appellate courts are not at liberty to weigh the evidence or to decide where the preponderance lies, but are limited to determining whether there is material evidence to support the verdict; and in determining whether there is material evidence to support the verdict, the appellate court is required to take the strongest legitimate view of all the evidence in favor of the verdict, to assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and to discard all to the contrary. Having thus examined the record, if there be any material evidence to support the verdict, it must be affirmed; if it were otherwise, the parties would be deprived of their constitutional right to trial by jury.

*Crabtree Masonry Co., Inc. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978).

We first address whether there was material evidence to support the jury's verdict that a contract existed between Defendants and Plaintiff and that Defendants breached that contract. Defendants argue that Plaintiff failed to offer material evidence that an employment contract for a definite term existed.

A contract "need not be in writing unless required by law . . . ." *Bill Walker & Assocs., Inc. v. Parrish, d/b/a Parco Enters., Inc.*, 770 S.W.2d 764, 771 (Tenn. Ct. App. 1989). In Tennessee, the general rule is that "a contract for employment for an indefinite term is a contract at will and can be terminated by either party at any time without cause." *Bringle v. Methodist Hosp.*, 701 S.W.2d 622, 625 (Tenn. Ct. App. 1985). However, our Supreme Court has stated that "a hiring at so much per week, or month, or year is a hiring for that period, provided there are no circumstances to the contrary." *Delzell v. Pope*, 294 S.W.2d 690, 694 (Tenn. 1956). Interpreting *Delzell*, this Court stated:

> [O]ur Supreme Court apparently aligned itself with those courts that recognize 'a hiring at so much per week, or month, or year is a hiring for that period, provided there are no circumstances to the contrary.' In doing so, however, the Court emphasized that the time of payment, of itself, is not conclusive that the parties have agreed that the employment or agency is to continue for the pay period, but is a material circumstance to be considered, in connection with other relevant facts.

*McCall v. Oldenburg*, 382 S.W.2d 537, 540 (Tenn. Ct. App. 1964) (quoting *Delzell*, 294 S.W.2d at 694).

Plaintiff testified he was offered "$75,000 per year in salary and 10% commission of net profits" to be the "general manager of the used car super center." He further testified he and Defendants had an oral contract "specifically for the year that was indicated in the salary." In addition, the verification of employment form signed by Mr. Simone was offered into evidence. Plaintiff testified that the form states his gross base pay was "seventy-five thousand dollars ($75,000.00) annually, plus commissions." Evidence also was presented showing Plaintiff never was paid based upon an annual salary of $75,000, and that he was fired before working for Defendants for a year. This evidence is both material and supports the jury's verdict that Plaintiff and Defendants had a contract for a definite term and that Defendants breached that contract. As there is material evidence to support the verdict, we will not set aside the jury's verdict on this basis. We affirm on this issue.

We next consider whether there was material evidence to support the jury's verdict that there was detrimental reliance. Detrimental reliance also is referred to as promissory estoppel. *Foster & Creighton Co. v. Wilson Contracting Co., Inc.*, 579 S.W.2d 422, 427 (Tenn. Ct. App. 1978). Detrimental reliance involves "[a] promise which the promissor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance [and] is binding if injustice can be avoided only by enforcement of the promise." *Amacher v. Brown-Forman Corp.*, 826 S.W.2d 480, 482 (Tenn. Ct. App. 1991) (citation omitted). Detrimental reliance requires the plaintiff to show that the defendant made a promise upon which the plaintiff reasonably relied and that the reliance resulted in detriment to the plaintiff. *Engenius Entm't, Inc. v. Herenton*, 971 S.W.2d 12, 20 (Tenn. Ct. App. 1997).

Plaintiff testified Defendants promised to pay him $75,000 a year, plus 10% commissions on net profits. Plaintiff testified the verification of employment form signed by Mr. Simone and provided to Plaintiff's lender stated his gross base pay was "seventy-five thousand dollars ($75,000.00) annually, plus commissions." Plaintiff testified that in order to accept the job with Defendants, he left his long-time job at Grindstaff. He testified that the previous year he had made a total of $66,227 in salary and incentives working as the general sales manager of Grindstaff Kia and as the assistant used car manager. Evidence also was presented which showed that when Plaintiff accepted the job with Defendants, he and his wife were refinancing their mortgage to change from a thirty-year one to a fifteen-year one with higher monthly payments. The evidence further showed Plaintiff suffered from relying on Defendants' promise because Plaintiff was paid by Defendants an amount per month that was less than his monthly expenses.

Defendants cite *Rampy v. ICI Acrylics, Inc.*, for the proposition that "the foregoing of other employment opportunities, even for better pay, is a necessary part of participating in the labor market, and does not constitute sufficient detriment to invoke the doctrine of promissory estoppel." *Rampy v. ICI Acrylics, Inc.*, 898 S.W.2d 196, 211 (Tenn. Ct. App. 1994). We note, however, that in *Rampy*, this Court was applying the law of Mississippi, not Tennessee. However, even if the *Rampy* rule applies and Plaintiff cannot rely upon leaving his job at Grindstaff to show detrimental reliance, Plaintiff still produced other material evidence to support his claim. Plaintiff continued with the process of refinancing his home, which resulted in a higher monthly payment, based upon his reliance on the promises made by Defendants. Plaintiff, and his lender, relied upon the verification of employment form which Plaintiff testified showed Plaintiff's salary to be "seventy-five thousand dollars ($75,000.00) annually, plus commissions." Thus, there was material evidence to support the jury's verdict that Plaintiff relied to his detriment on the promises made by Defendant. We, therefore, affirm on this issue.

Next, we consider whether there was material evidence to support the jury's verdict that Defendants violated Tenn. Code Ann. § 50-1-102. In pertinent part, Tenn. Code Ann. § 50-1-102 states:

> It is unlawful for any person to induce, influence, persuade or engage workers to change from one (1) place to another in this state, or to bring workers of any class or calling into this state to work in any type of labor in this state through or by means of false or deceptive representations, false advertising or false pretenses, concerning the kind and character of the work to be done, or amount and character of the compensation to be paid for such work . . . .

Tenn. Code Ann. §50-1-102(a)(1) (2003).

Plaintiff offered evidence of false or deceptive representations both concerning the kind and character of the work to be done and of the amount and character of the compensation to be paid. Specifically, Plaintiff testified he was hired to be the general manager of the used car super center, a position that existed or would exist in the near future. However, Mr. Leipuner testified that

sometime after he and Mr. Simone talked to Plaintiff about Plaintiff's filling that position but before Plaintiff was hired, Mr. Leipuner and Mr. Simone "decided [they] weren't going to go that route and [they] didn't do anything about it for a couple of months." Plaintiff testified he was not informed of this change and believed when he was hired that he was to be the general manager of the used car super center.

Regarding the amount and character of the compensation, Plaintiff testified Defendants agreed to pay him $75,000 a year, plus 10% commissions on net profits. However, Plaintiff actually was paid based upon an annual salary of approximately $29,000 per year and received only $3,000 in bonus checks. Plaintiff testified that had he been paid 10% commissions on net profits, based upon the information Defendants provided, he would have received approximately $23,500 during the time he was employed. In addition, the evidence showed that shortly after Plaintiff began to work for Defendants, Mr. Simone requested a copy of Plaintiff's resume to forward to Daewoo because "they would need a sales manager with import experience," which Plaintiff had as a result of his previous employment. This evidence is material and supports the jury's findings and verdict that Defendants violated Tenn. Code Ann. § 50-1-102. We affirm on this issue.

We next consider whether there was material evidence to support the amount of damages awarded to Plaintiff. "A jury verdict within the bounds of proven damages does not require a remittitur." *England v. Burns Stone Co., Inc.*, 874 S.W.2d 32, 39 (Tenn. Ct. App. 1993).

Plaintiff presented evidence showing damages in the amount of $103,224.48, which broke down to $35,653.71 in salary and $67,570.77 in commission on net profits. Since Defendants did not comply with proper discovery requests, the Trial Court properly exercised its discretion in allowing Plaintiff to utilize the figures for the first four months of 2000, and to request the jury multiply this amount by three to determine his damages, if any, based upon net profits. Plaintiff's testimony and the documentary evidence showing Defendants' net profits supported the amount Plaintiff requested. Plaintiff subtracted from the damages requested the money he earned during the remainder of the contract year from the job he obtained after Defendants fired him. Plaintiff also subtracted the $3,000 he received from Defendants in bonus checks. The jury awarded Plaintiff $55,000 in damages. As there is material evidence to support the jury's award of damages of $55,000, and as the jury's award is within the bounds of proven damages, we affirm on this issue.

Finally, we consider whether the Trial Court abused its discretion in awarding pre-judgment interest. Our Supreme Court has stated:

[a]n award of prejudgment interest is within the sound discretion of the trial court and the decision will not be disturbed by an appellate court unless the record reveals a manifest and palpable abuse of discretion. This standard of review clearly vests the trial court with considerable deference in the prejudgment interest decision. Generally stated, the abuse of discretion standard does not authorize an appellate

court to merely substitute its judgment for that of the trial court.  Thus, in cases where the evidence supports the trial court's decision, no abuse of discretion is found.

*Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998) (citations omitted).  In *Scholz v. S.B. Int'l, Inc.*, this Court discussed awards of prejudgment interest stating:

> Parties who have been wrongfully deprived of money have been damaged in two ways.  First, they have been damaged because they have not received the money to which they are entitled.  Second, they have been damaged because they have been deprived of the use of that money from the time they should have received it until the date of judgment.  Awards of pre-judgment interest are intended to address the second type of damage.  They are based on the recognition that a party is damaged by being forced to forego the use of its money over time.  Thus, our courts have repeatedly recognized that prejudgment interest is awarded, not to punish the wrong-doer, but to compensate the wronged party for the loss of the use of the money it should have received earlier.

*Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d 78, 82 (Tenn. Ct. App. 2000) (citations omitted).

The evidence and the jury verdict support a finding that Plaintiff was deprived by Defendants of the use of the money he should have received earlier.  The evidence supports the Trial Court's decision, and thus we find no abuse of discretion in the Trial Court's award of prejudgment interest.  We, therefore, affirm on this issue.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for such further proceedings as may be required, if any, consistent with this Opinion and for collection of the costs below.  The costs on appeal are assessed against the Appellants, Cherokee Buick-Pontiac-Oldsmobile-GMC Truck, LLC and Cherokee New Car Alternative, LLC, and their surety.

_____
D. MICHAEL SWINEY, JUDGE

-9-