IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 14, 2018 Session

**JUNE ACUFF v. SALLY BAKER**

**Appeal from the Circuit Court for Shelby County**
**No. CT-002525-16  Felicia Corbin Johnson, Judge**

_____

**No. W2018-00687-COA-R3-CV**

_____

This appeal involves a complaint for damages for breach of an alleged oral agreement to conduct an estate sale. After a bench trial, the trial court awarded Appellee damages for breach of contract, negligent bailment, and violation of the Tennessee Consumer Protection Act ("TCPA"). For violation of the TCPA, the trial court trebled the compensatory damages awarded Appellee and also awarded attorney's fees and costs against Appellant. Because the parties did not have a sufficiently definite agreement to be enforceable, we reverse the trial court's award of damages for breach of contract. We also reverse the trial court's findings of negligent bailment and violation of the TCPA, which resulted in the award of treble damages and attorney's fees. We affirm the trial court's award of the sale proceeds to Appellee.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed in Part; Reversed in Part and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN and BRANDON O. GIBSON, JJ., joined.

Scott A. Kramer, Memphis, Tennessee, for the appellant, Sally Baker.

Kevin A. Snider, Germantown, Tennessee, for the appellee, June Acuff.

**OPINION**

**I. Background**

The facts of this case are quite protracted; however, in the interest of judicial economy, we will provide a truncated version of the relevant facts and procedure. June Acuff ("Appellee") and Sally Baker ("Appellant") orally agreed that Ms. Baker would conduct an estate sale on Ms. Acuff's behalf. It is undisputed that, at the time of the

agreement, Ms. Acuff was experiencing a difficult time due to the recent deaths of her two daughters. Ms. Acuff was also having health issues. In an effort to prepare two of her houses, the McVay Trail house ("McVay house") and the White Station house ("White Station house"), for sale, Ms. Acuff engaged Ms. Baker to help with organizing and cleaning out these properties, and conducting an estate sale. Ms. Acuff owned several pieces of antique furniture, some of which she wanted to sell and some of which she wanted to keep. Ms. Baker represented to Ms. Acuff that she had an associate, Susan Colwell, who could help in pricing Ms. Acuff's antiques for the estate sale. There was conflicting testimony regarding whether Ms. Baker represented to Ms. Acuff that Ms. Colwell was an appraiser, or whether she merely represented that Ms. Colwell was familiar with antiques. It is undisputed that the parties orally agreed that Ms. Baker would receive three thousand dollars ($3,000.00) plus fifteen percent (15%) of the estate sale proceeds as her fee. Although the parties never signed a written contract, the terms of Ms. Baker's fee are not disputed.

As well as helping Ms. Acuff clean out her two houses, there is evidence that Ms. Baker also hired movers to carry Ms. Acuff's items to and from her homes. The parties dispute whether Ms. Acuff agreed to reimburse Ms. Baker for the moving services. In addition to the White State house and the McVay house, Ms. Baker also cleaned out Ms. Acuff's son-in-law, Tucker Beck's, attic at his house on Kaye Road ("Kaye Road house"). The parties dispute whether Ms. Acuff agreed to pay Ms. Baker for these services.

After cleaning and organizing Ms. Acuff's houses over a three week period, Ms. Baker conducted a three-day estate sale. Ms. Baker claims the estate sale netted six thousand seven hundred and eighty-two dollars ($6,782.00). From this total, she deducted her fee of three thousand dollars ($3,000.00) plus fifteen percent (15%) of the proceeds, which amount totaled one thousand seventeen dollars and thirty cents ($1,017.30). Ms. Baker also deducted, from the sale proceeds, two thousand one hundred and ninety-two dollars and forty cents ($2,192.40) for "additional labor and expenses not included in fee." The total proceeds left to Ms. Acuff, after these deductions, was five hundred and seventy-two dollars and sixty cents ($572.60). Ms. Baker mailed Ms. Acuff a check for this amount along with receipts from the estate sale. In the same package, Ms. Baker included a Goodwill receipt for donated items. When Ms. Baker and Ms. Colwell finished cleaning up the McVay house after the sale, Ms. Baker left her set of keys to the house on a counter in the house, locked the door, and left.

The facts surrounding the organization, clean out, and sale of items from the houses are largely disputed. The specific disputes are discussed, *infra*, however, suffice it to say that issues concerning pricing, items offered for sale versus items not for sale, items taken by Ms. Acuff's family, the net proceeds of the sale, the accounting for the items sold, the donation of certain items to Goodwill, and allegations concerning lost or stolen items, led to the instant lawsuit. We glean from the record that the major issues in

this case concern several antiques that Ms. Acuff claims are either missing, were sold at an unreasonably low price, or were stolen. Trial exhibit 14 is a list that Ms. Acuff created of twenty-one "missing items;" this list contains a description of the item and its alleged fair market value. As is relevant to this appeal, Ms. Acuff argues that the receipts from the estate sale do not demonstrate that her Austrian pine mantelpiece,[1] English breakfast hutch,[2] or Walnut French sideboard were sold.[3] Furthermore, Ms. Acuff alleges that she instructed Ms. Baker not to sell three antique clocks,[4] and that the clocks were not in the McVay house after the sale. Ms. Baker argues that the Austrian pine mantelpiece, English breakfast hutch, and Walnut French sideboard were all sold at the estate sale. She also argues that the group receipts, admitted into evidence at trial, do not contain all of the receipts she mailed to Ms. Acuff after the sale. Additionally, she alleges that some of Ms. Acuff's antiques were in a poor condition and not worth as much as Ms. Acuff anticipated. Further, Ms. Baker argues that she did not sell the three antique clocks and that they were left in the McVay house when Ms. Baker locked the house. Essentially, the parties' theories of the case are as follows: Ms. Acuff argues that Ms. Baker either stole her furniture, sold it for an unreasonably low price, or that the furniture was stolen while in Ms. Baker's care and keeping; Ms. Baker argues that Ms. Acuff lost some of the sales receipts, that the antiques were not as valuable as Ms. Acuff believed, and that Ms. Acuff's family members removed the furniture she cannot find.

On October 12, 2015, Ms. Acuff filed a Civil Warrant in the Shelby County General Sessions Court, alleging breach of contract and seeking costs and attorney's fees. On June 6, 2016, the general sessions court entered judgment in favor of Ms. Baker. On June 7, 2016, Ms. Acuff timely appealed to the Shelby County Circuit Court ("trial court"). In her complaint, filed July 29, 2016, Ms. Acuff alleged: (1) breach of contract; (2) negligent bailment; (3) conversion; and (4) a violation of the Tennessee Consumer Protection Act ("TCPA"). Ms. Baker answered on August 24, 2016.

On February 26 and 27, 2018, the trial court held a bench trial. By order of March 16, 2018, the trial court awarded Ms. Acuff damages for breach of contract, negligent bailment, and violation of the TCPA.[5] The trial court did not find conversion. The trial court held that Ms. Baker could not recover for the additional labor and expenses she billed Ms. Acuff and that she was not entitled to her fee of three thousand dollars ($3,000.00) plus fifteen percent (15%) of sale proceeds. Therefore, the trial court concluded that Ms. Baker owed Ms. Acuff the entire six thousand seven hundred and eighty-two dollars ($6,782.00) in sale proceeds. The trial court also awarded Ms. Acuff what Ms. Acuff claimed was the fair market value of four of her "big ticket items" that she alleges were not accounted for after the sale. These items were valued at thirty-four

---

[1] Ms. Acuff's exhibit indicates this item is worth $12,000.00.
[2] Ms. Acuff's exhibit indicates this item is worth $7,200.00.
[3] Ms. Acuff's exhibit indicates this item is worth $8,900.00.
[4] Ms. Acuff's exhibit indicates the clocks are worth $6,800.00 total.
[5] The trial court incorporated the transcript of its oral ruling into its final order.

thousand nine hundred dollars ($34,900.00).[6] In total, the trial court awarded Ms. Acuff compensatory damages of forty-one thousand six hundred and eighty-two dollars ($41,682.00). For violation of the TCPA, the trial court awarded treble damages in the amount of one hundred and twenty-five thousand forty-six dollars ($125,046.00). Finally, the trial court awarded Ms. Acuff costs and attorney's fees in the amount of thirty-two thousand one hundred and forty-four dollars and ninety-eight cents ($32,144.98). In sum, the total judgment against Ms. Baker was one hundred and fifty-seven thousand one hundred and ninety dollars and ninety-eight cents ($157,190.98). Ms. Baker appeals.

## II. Issues

Ms. Baker raises six issues in her brief; however, we perceive that there are four dispositive issues, which we state as follows:

1. Whether there is clear and convincing evidence to overturn the trial court's credibility findings.

2. Whether the trial court erred in finding that an oral contract existed between the parties.

3. Whether the trial court erred in finding negligent bailment.

4. Whether the trial court erred in finding that Ms. Baker violated the Tennessee Consumer Protection Act.

## III. Standard of Review

This case was tried without a jury. Therefore, we review the trial court's findings of fact *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). The trial court's conclusions of law, however, are reviewed *de novo* and "are accorded no presumption of correctness." ***Brunswick Acceptance Co., LLC v. MEJ, LLC***, 292 S.W.3d 638, 642 (Tenn. Ct. App. 2008).

## IV. Trial Court's Credibility Findings

The trial court made credibility findings as to Ms. Acuff, Ms. Baker, and Ms. Colwell. In ***Wells v. Tennessee Board of Regents***, 9 S.W.3d 779 (Tenn. 1999), the Tennessee Supreme Court explained that

---

[6] The "big ticket items" were the Austrian pine mantelpiece, the English breakfast hutch, the Walnut French sideboard, and the three antique clocks.

trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990); *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. *See Tenn-Tex Properties v. Brownell-Electro, Inc.*, 778 S.W.2d 423, 425-26 (Tenn. 1989); *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *See Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315, 315-16 (Tenn. 1987); *Bingham v. Dyersburg Fabrics Co., Inc.*, 567 S.W.2d 169, 170 (Tenn. 1978).

*Wells*, 9 S.W.3d at 783. Although this Court routinely defers to a trial judge's assessment of a witness' credibility, such findings are not absolute. Rather, where there is clear and convincing evidence undermining a trial court's credibility finding, this Court will reverse the finding and proceed with its review on the evidence alone.

### A. Ms. Acuff

After extensive review of the record, this Court is of the opinion that there is clear and convincing evidence to negate the trial court's finding that Ms. Acuff was a credible witness. With regard to her credibility, the trial court found, in pertinent part that

Ms. Acuff, although she was going through a very, very difficult time, was very, very credible in her testimony. There were certain things that she couldn't remember, but overall her testimony was very credible.

Our review, however, found many inconsistencies and incongruities in Ms. Acuff's testimony. Specifically, there were three issues with her testimony: (1) Ms. Acuff was unresponsive to many questions; (2) Ms. Acuff could not remember or did not know information that went to the gravamen of her case; and (3) her testimony was inconsistent. Although it is not our practice to insert multiple pages of transcript into our opinions, given that we must negotiate the high standard of clear and convincing evidence to overturn a credibility finding, the following recitation of testimony is necessary.

In the first instance, much of Ms. Acuff's testimony was unresponsive to the question asked. For example, when asked about what happened when Erin Galtelli, Ms. Acuff's daughter, arrived at the McVay house the day before the sale, Ms. Acuff explained: (1) how she built the McVay house for her parents for their 50th wedding anniversary; (2) the size of the house; and (3) that many family members stored their belongings in that house before concluding, "and I don't know what you asked me."

Much of Ms. Acuff's testimony is at best unfocused and, at worst, unresponsive to the question posed.

Furthermore, there were several points in Ms. Acuff's testimony where she admitted that she either did not know what she wanted during the relevant period of time or did not remember pertinent information during the relevant period of time. For example, when opposing counsel asked Ms. Acuff to describe the circumstances surrounding the estate sale, Ms. Acuff stated: "I don't know a lot of things that happened in all of that." When opposing counsel questioned Ms. Acuff about what occurred at the McVay house the day before the estate sale, Ms. Acuff said: "[q]uite frankly, I don't know what happened afterwards until [Ms. Galtelli] got there." Additionally, Ms. Acuff testified that she was explicitly told not to attend the estate sale; however, when opposing counsel asked if she had wanted to attend the sale, Ms. Acuff said: "I don't know what I wanted at that point in time, okay?" We do not understand how the trial court was able to find Ms. Acuff's testimony credible regarding the circumstances surrounding the estate sale when Ms. Acuff admitted that she did not know what happened and did not know what she wanted during that period of time. The trial court also found that there "were certain things that [Ms. Acuff] couldn't remember," but it did not elaborate. While some forgetfulness is expected with the passage of time, and unclear facts may not bear on the outcome of a case, here the facts Ms. Acuff forgot go to the gravamen of her lawsuit.

Moreover, Ms. Acuff gave contradictory testimony concerning issues that were pertinent to her causes of action against Ms. Baker. For example, with regard to whether Ms. Acuff would attend the sale, she testified on direct examination:

Q. Did you have any discussions with [Ms. Baker] as to whether or not you should attend the estate sale?

A. Yes, but she told me to stay away.

Q. Did she say why you should stay away from the estate sale?

A. Well, it made sense to me. I mean, you know, if somebody picked up an item and I wanted $30 for it and they offered $29. You know, of course, [Ms. Baker would] take it. Any logical person would take it. But, I might say, well, you know, get in the conversation. I know I'd get in the conversation of saying how much I paid for it, you know.

However, on cross-examination, Ms. Acuff testified:

Q. You weren't told by Ms. Baker that you could not be there during the sale, were you?

- 6 -

A. I was told not to be there, emphatically.

Q. Were you told that it might be easier if you weren't there, because some people don't -

A. It really wasn't explained to me.

Q. If Ms. Baker testifies that she explained to you that some people don't do well seeing all of their stuff being sold in an estate sale, would you disagree with that?

A. That's logical.

Regarding her communication with Ms. Baker during the sale, Ms. Acuff testified:

Q. So, the sale happened. Were you provided any information after the sale as to what was sold, what was not sold?

A. After the sale?

Q. Yes.

A. I heard nothing. Nothing from her, nothing.

Q. No phone call? No check?

A. She called me once and told me - and I just thought, well isn't that nice, that she was going to stay there through Monday and see if anybody else came back. She called me once during the sale and told me someone had offered $400 for one of my clocks, and I said just take the clocks and mark them all sold. Do not sell the clocks. I figured I'd just stop that right there.

However, on cross-examination, Ms. Acuff testified:

Q. Did Ms. Baker argue with you about that?

A. No. This lady was amenable during my whole association with her. You know -- I was asked a while ago about her contacting me and I thought about it when I was eating lunch. I wonder why she never contacted me -- you know, why didn't she call me and - but, no, she was never whatever you asked me.

Q. Now, what [do] you mean why didn't she call you? During what period

of time?

A. Well, while the sale was going on, I'm doing this or blah, blah, blah. I got a couple of texts from her and I brought those texts. They were -- I copied those texts. How I did it, I don't remember.

Q. But she did communicate with you during the sale, didn't she?

A. No. She called me about the clock.

Q. So, I'm not understanding. You're saying no she didn't communicate with you, but yet she talked to you about the clocks.

A. And then she called me about staying there until Monday.

Q. Okay. Well, that[] seems to be at least two times that she contacted you during the sale, correct?

A. Yes.

Q. But you testified that she didn't speak with you at all during the sale?

A. She didn't handle herself like I would have if I was representing a lady who had just lost a child and I was selling every piece of belonging that she had accumulated in her lifetime and was in the hospital. I would make contact with them at least every six hours telling them the progress of what was going on. So, no, she didn't contact me like I would have.

There are other examples of contradictory testimony by Ms. Acuff which we will not tax the length of this opinion to reproduce. However, given her assertion that items were missing after the sale, Ms. Acuff's testimony regarding her return to the McVay house after the sale is of particular importance. Concerning her return to the house after the sale, on this point, she testified:

Q. . . . When is the next time you were at the McVay Trail home?

A. I wish I knew the date. It was when I found it empty, but I don't know when that was.

Q. Was that one week later, two weeks, one month, two months?

A. No. It wasn't two months. It was - - maybe it was Tuesday. Hell, I don't know. Maybe it was Wednesday. I don't know.

- 8 -

Q. Tuesday would be the next day and Wednesday would be the second day. So, it was sometime within a week?

A. Yes.

***

A. So, it had to have been at least three days after the sale.

Q. Why do you say that?

A. Because it was completely empty. I'm trying to think. No, that was two or three weeks after that. No, it was a long time after that. When I was over there in the yard. See, none of the -- I'm not going to go into that.

From her testimony, Ms. Acuff was unable to specify a clear timeline of when she returned to her house after the sale. With regard to whether any items were left in the house upon her return, Ms. Acuff testified on direct examination:

Q. All right. Now, after the sale, I'm assuming you went back to your house, correct?

A. Yes, sir.

Q. What was -- and you were going to go back there [to] go through what else could be sold now that wasn't sold then?

A. Yes. It was empty.

Q. What do you mean it was empty?

A. My house was empty. Everything was gone. There wasn't anything left in my home. Nothing.

However, on cross-examination, Ms. Acuff testified:

Q. Now, when you say the house was empty when you got there, there was not one piece of furniture in it?

A. There was some keys on a key chain or a key or two keys -

Q. On the counter.

- 9 -

A. On the counter.

Q. And other than that, there was not one piece of furniture in the whole house; is that correct?

A. That's right.

***

Q. Can you tell me if you can identify any of those pictures, ma'am?

A. This is the upstairs room and those chairs and that dresser are still sitting there to this day. That chair and that nightstand was not and nothing on the dresser was there. So, that was there.

***

A. This is two of the clocks. They weren't there. I don't know about the mirror. That mirror was -- my mother was born in 1912. She got married when she was 21 and she got that mirror for her wedding present, but I don't even know where that is. In this one, the television was not there. It's gone. I don't know about all those boxes and mirrors and what have you. The dresser and the chest of drawers, it was in that front bedroom that nobody was supposed to go in. There's a clock here on the floor. It wasn't there. I don't know about all the others.

Q. But some of those items in that picture were still there, correct?

A. Yes. The dresser and this and this and this was still there.

Q. Okay. What about the bottom picture?

A. The bottom picture is more or less that. You know, this was there. All of this other stuff wasn't there.

***

Q. Ms. Acuff, after looking at those pictures, I believe I just heard you tell the [c]ourt that several items that appear in those pictures were in the McVay Trail house the first time you went in after the sale; is that correct?

A. Correct.

- 10 -

Q. I'm trying to reconcile that with what you said about 15 minutes ago when you said there was not one piece of furniture in the house when you walked in.

A. Well, those weren't supposed to be part of sale. They were in there -- she put those in there before the sale ever started. It wasn't even a part of the sale.

Q. Okay, well -

A. It was like they were nonexistent, but even the nonexistent stuff that wasn't supposed to be considered, even some of that walked away.

Q. But, in fact, there were a number of items of furniture in the McVay Trail home when you went in after the sale, correct?

A. It was what you showed me in those pictures, yes.

Q. So, you are not disputing there was furniture in the house?

A. There were my kitchen chairs. There were six of them upstairs and that little French dresser was upstairs, in the corner, and it's still there. And my mother's bedroom suite that was purchased in the '20s. The dresser and the chest of drawer were still there.

After emphatically stating that her entire house was empty after the estate sale, Ms. Acuff later admitted that there were several pieces of furniture left in the house after the sale. In fact, Ms. Acuff's testimony on this point contradicted her own trial exhibit. On direct examination Ms. Acuff described the furniture in a photograph, which was admitted into evidence as exhibit 7:

Q. Okay. And what are we looking at?

A. We are looking at some Victorian furniture that was setup upstairs in 2890 McVay Trail. We are looking at two antique lamps that were originally oil lamps that had been converted to electricity that were well over 200 years old. We're looking at one of the two marble top coffee tables, two of the four marble top end tables, a settee, and a Victorian chair, one of twenty. So, you know, they're old, but they were taken that day.

Q. Okay. And does this picture accurately reflect the way it looked in your house at the time it was turned over to [Ms. Baker]?

A. It was taken that day.

Q. All right. Do you know what happened to this?

A. It's gone. Everything -- my whole life is gone. It's gone.

Ms. Acuff's list of "missing items," with their corresponding fair market value, was exhibit 14. "2 Victorian settees @ $500 each" appeared on this list. Presumably one of the settees Ms. Acuff is discussing in the foregoing testimony was one of the "2 Victorian settees" listed on her missing items list. However, this evidence and testimony was contradicted by a handwritten note on the back of the picture, which was admitted as exhibit 7. The handwritten note stated: "She sold the Victorian Setees [sic] for $75 each -- valued for estate sales price $800 each." In her testimony, Ms. Acuff stated that the settee was gone. This was bolstered by exhibit 14, Ms. Acuff's missing items list. However, both the testimony and the missing items list were contradicted by the handwritten note on the back of exhibit 7, which explained that Ms. Baker sold both settees at the estate sale for seventy-five dollars ($75) each. Furthermore, one receipt from the estate sale represented that a "sofa" was sold for seventy-five dollars ($75). Despite this evidence and the handwritten note on the back of exhibit 7, Ms. Acuff nonetheless testified that the settees were "gone" and further included them on her "missing items" list.

One of the major disputes in this case concerns the receipts from the estate sale. Ms. Baker alleges that she mailed all of the receipts to Ms. Acuff. Ms. Acuff argues that the receipts do not total the net proceeds from the sale. Ms. Baker implies that Ms. Acuff lost some of the receipts. Ms. Baker and Ms. Acuff agree that Ms. Baker mailed an envelope to Ms. Baker that contained receipts as well as a check for five hundred and seventy two dollars and sixty cents ($572.60). When asked whether she ever negotiated the check, Ms. Baker testified: "No. I lost it. I guess. I don't know what I did with it, but I did not mean to cash it." Ms. Acuff's admission that she "lost" the check, which was delivered to her in the same envelope as receipts from the sale, casts doubt on her argument that Ms. Baker failed to include all sales receipts in the same mailing.

Based on the foregoing excerpts from Ms. Acuff's testimony and the record as a whole, we conclude that there is clear and convincing evidence to negate the trial court's finding that Ms. Acuff was a credible witness. While some contradictions, omissions, and inconsistencies in testimony are expected, as discussed above, the problems with Ms. Acuff's testimony go to the crux of her claims and her burden of proof thereon.

### B. Ms. Baker

The trial court made the following findings with regard to Ms. Baker's credibility:

The [c]ourt listened very carefully to Ms. Baker, and Ms. Baker was just not credible on some of her testimony. For example, just little things. When asked about the items being taken to the Goodwill, she testified that there were items taken prior to the sale and after the sale and then when asked on cross-examination about these receipts that were received from Goodwill, she said well, there are two receipts. Ms. Baker is not responsible perhaps, I mean, [Ms. Acuff's counsel] doesn't disagree that Goodwill or many organizations where you donate things give blank receipts, but it is not even so much as receiving a blank receipt. This is not a receipt that was given for two separate transactions: one prior to the sale and one after the sale. This is one receipt. . . . This is not two receipts copied on one piece of paper. This is one receipt that was given and when they gave her the receipt, they didn't cut off the bottom receipt, they just gave her one full receipt and it was copied, which is why they filled out the front, but you can see the perforation on here. This is not where there were two receipts, put on a copy machine and copied. This is just one receipt. So it was very clear to the [c]ourt that Ms. Baker was attempting to say whatever she needed to say to put the pieces together, but the fact of the matter is that Ms. Baker did not have a contract and she should have had a written contract. I don't think anyone in here would dispute that.

After review, we conclude that there is clear and convincing evidence to reverse the trial court's finding that Ms. Baker's testimony concerning the Goodwill receipts was not credible. When viewed in context, it is clear that Ms. Baker clearly explained the facts surrounding the Goodwill receipts despite opposing counsel's intense questioning, to-wit:

Q. How many boxes and bags and those types of items did you give away, throw away or give to Goodwill?

A. I don't know that I have a count. I know that it was several.

Q. So you have no idea, do you? Let's be honest.

A. I do and I don't. I mean I can't give you a number.

Q. That's because you kept no records, right?

A. But I was there and I saw these things and it was all -

Q. Well, I know you were there. Ms Acuff wasn't there and that's the problem. She hired you to do a service and you can't account for what happened to all these items.

A. She was there for quite a bit of this.

Q. Was she there when you gave all of this stuff to Goodwill?

A. Some of it.

Q. She was?

A. Some of it, yes, sir.

Q. And that was on a Thursday. You're saying Ms. Acuff was there?

A. She was -- this all didn't happen the day before the sale. Throughout the process of pulling things from Kaye Road and going through them and determining we can try to sell this, this is not worth it, we would put it and it would go, some of it went on the street, she saw that. Some of it went to charity, she sa[w] that.

Q. So, during this whole process when you were out there a couple of weeks you were getting rid -- disposing and giving items to Goodwill all along, that's your sworn testimony?

A. Yes, sir.

Q. Where's the documents for that? You have one blank Goodwill receipt.

A. There's two here and they're not -- that's what they give you.

Q. Okay.

A. They do not -

Q. Whose name's on it?

A. You could go to any Goodwill right now and you drive up and you have a trunk load of things and you give it to them, this is what they give you.

Q. I agree. We can agree on something.

A. It is up to you to write in your name, your address, your everything to utilize this and you can claim whatever value you want. They have gone to this system.

- 14 -

Q. So that's what Ms. Acuff hired you to do, correct? How would she know what to put on there if she didn't know what you gave away?

A. You can only claim a certain amount, but because Goodwill does this you could go and take a suitcase and they would give you this and you could say that you had 50 things. It's up to the discretion of the person -- she can put on here whatever she wants to.

Q. Ma'am, you agree Ms. Acuff hired you to get rid of things, dispose of things, sell things, correct?

A. Yes, and I did that.

Q. How would Ms. Acuff know what to put on to claim a charitable tax deduction if you didn't give her a list of what you gave for charitable taxes?

A. I verbally told her some of the things, some of the things she saw, some of the things she saw that she knew we were going to [do] that with and she knew that there [was] a volume of things, but there was no way to I would have been there for two weeks writing everything, itemizing what we gave to Goodwill because it was collective things.

Q. Collective things?

A. Yes, sir.

Q. But that is the receipt that you ultimately gave her or two receipts as you call it, correct?

A. Yes. I thought I gave her more than this number throughout the time when I would take something, I would give her a receipt.

Q. Okay. And I'm guessing you have no records of that either, correct?

A. Because they give you one receipt and it's hers. This is her donation, this is her receipt.

Q. What is the date on that receipt?

A. This one says the 8th, this other one doesn't have a date.

Q. The 8th of what?

- 15 -

A. August 2015, so this is after the sale, but I had receipts prior to that that I gave her.

Q. That you don't have copies of either, correct?

A. I wouldn't make a copy of a Goodwill receipt that was blank that I gave to a client for them to be able to utilize however they wanted to.

Q. Okay.

A. But I gave it to them because I needed to have it for their records.

Importantly, Ms. Baker's testimony contains no contradictions concerning the Goodwill receipts. Ms. Baker explained that, throughout her dealings with Ms. Acuff, Ms. Baker sorted items and took them to Goodwill. After receiving receipts, she passed them along to Ms. Acuff. From our review, Ms. Baker's testimony does not demonstrate that she "was attempting to say whatever she needed to say to put the pieces together." In this regard, the trial court's finding is unsupported as Ms. Baker's testimony clearly and convincingly outlines the steps she followed in cleaning out Ms. Acuff's houses.

The trial court also made credibility findings with regard to Ms. Baker's testimony concerning the antique clocks, to-wit:

The [c]ourt is not persuaded that the clocks that were left on the wall were left. Ms. Baker's excuse that she did not want to remove the clocks because she didn't want to damage the clocks is just not credible. Ms. Baker could have hired, at the expense of Ms. Acuff, someone to remove those clocks, to place them in safekeeping, so that they would be separated or at least recommend to Ms. Acuff that she come get these items and put them in safekeeping.

Ms. Baker testified, in relevant part:

Q. Were there three wall clocks for sale?

A. There were three clocks that were wall clocks that were still hanging on the wall. We didn't feel comfortable moving them. We had price tags on them. When [Ms. Acuff] came in and she saw the prices, she said no. So we wrote on them "not for sale." But we left them where they were because, again, I did not want to be responsible if I took it off the wall that the mechanism would be - there is a certain way that you have to move a clock and I was not comfortable doing that.

- 16 -

Q. Did anybody attempt to buy the clock?

A. Yes. We did have higher prices on them and then I would -- we took bids and I would either call June and I also have text messages that say, hey, I have someone here with $600 cash. Do you want to sell the clock and she said no. I respected that.

The trial court did not adequately explain its finding that "Ms. Baker's excuse that she did not want to remove the clocks because she didn't want to damage the clocks is . . . not credible." Clearly, the foregoing testimony shows that Ms. Baker was concerned about damage if the clocks were improperly handled. As for the trial court's opinion that Ms. Baker could have hired "someone to remove those clocks," there is no indication that Ms. Acuff requested such service or that the clocks were not better left undisturbed. As such, the trial court's finding on this point is nothing more than speculation. From the record, we conclude that the evidence clearly and convincingly demonstrates that Ms. Baker's testimony was not flawed by a lack of credibility.

### C. Ms. Colwell

The trial court made the following credibility finding concerning Ms. Colwell's testimony:

The [c]ourt struggled somewhat with Ms. Colwell's testimony and with all due respect to Ms. Colwell, I understand that she has had a professional relationship with Ms. Baker for a while, that she wants to maintain that professional relationship with Ms. Baker, but it was very clear to the [c]ourt that she was struggling tremendously with her testimony to say -- what to testify as to what she believed was the right answer, was the best answer, and she was very conflicted in terms of her testimony. Even so much so where the [c]ourt had to say to her, tell the truth, just answer the question because it was obvious that she didn't want to say anything to hurt her friend. But this is a court of law and once you take an oath, you are charged with having to tell the truth, even though it may have consequences for you or your business relationships.

We have reviewed Ms. Colwell's testimony and find clear and convincing evidence to reverse the trial court's finding that Ms. Colwell was "struggling," "conflicted," or dishonest in her testimony. In its ruling, *supra*, the trial court refers to the portion of Ms. Colwell's testimony where the court interjected its instruction to "tell the truth." In context, that portion reads:

Q. I'm going to hand you one more document. Ms. Colwell, I'm handing

- 17 -

you, compliments of Ms. Bethel at our office, as itemized out and put in chronological order every one of those approximately 250 receipts that are Exhibit 2.

Can you explain to me why those receipts don't even add up to the amount that is listed in Exhibit 1? Because according to Exhibit 1, the sale proceeds were $6 -- let me make sure we get the exact amount right. The total sale income of $6,782. Do you know why if you add up all those receipts in Exhibit 2, why it doesn't add up to $6,782?

A. I don't believe those are all the receipts.

Q. Okay. So you believe there are other receipts out there. Is that your sworn testimony?

A. I can't swear there are more receipts out there, but that does not look like all the receipts that would have been.

Q. Good. I'm assuming then being an estate sale experienced person that you are, you would have kept copies of these receipts, correct?

A. All the receipts got mailed to Ms. Acuff.

Q. So Ms. Baker didn't keep a copy of these receipts for her business records? Would you agree that that would be poor business practices?

A. I don't know how to answer that.

THE COURT: Just tell the truth, Ms. Colwell. Just answer the question.

A. Ask me the question again.

BY MR. SNIDER:

Q. If you do not keep copies of receipts of things you were selling for the customer, would you agree or disagree that that would be poor business practices for your business?

A. Yes. There are receipts for the items, yes.

Ms. Colwell's testimony corroborates Ms. Baker's testimony that exhibit 2 did not contain all of the receipts Ms. Baker mailed to Ms. Acuff along with the five hundred and seventy-two dollars and sixty cents ($572.60) check, which Ms. Acuff admittedly

misplaced. As for the trial court's instruction to "[j]ust tell the truth," Ms. Colwell appears to have done so by answering the question concerning Ms. Baker's recordkeeping with "I don't know . . . ." There is no evidence that Ms. Baker and Ms. Colwell were business partners such that Ms. Colwell would know Ms. Baker's business practices concerning sales receipts. Counsel's question, therefore, would have been better posed to Ms. Baker. At any rate, Ms. Colwell's answer does not indicate a pattern of untruthfulness. From the totality of her statements, we conclude that there is clear and convincing evidence to reverse the trial court's finding that Ms. Colwell's testimony was unreliable.

## D. The trial court

The trial court made other findings that are contradictory or unsupported by the evidence. For example, the trial court stated that Ms. Acuff is "a very astute business woman" although there is no evidence to support such a finding. Additionally, the trial court found that it "[couldn't] make heads or tails of [the estate sale] receipts:"

> There's no name on them to the individuals in which the items were sold, so that if there was not going to be an accounting and an inventory prior to the sale. If there were names and addresses, maybe more of a description of what items were being sold, perhaps Ms. Acuff would have a better idea about what happened to her items . . . .

We have reviewed the receipts and note that several do contain names and phone numbers of the purchasers. Additionally, some of the receipts contain descriptions of the item sold, such as "marble top table" or "green chest." In this regard, the evidence simply does not support the trial court's finding that there were no names or items listed on these receipts.

Furthermore, in its oral ruling, the trial court stated that "[Ms. Baker] did not do a walkthrough with Ms. Acuff." Then, within one page of transcript, the trial court stated that Ms. Baker "took actual possession of [the estate sale items] after Ms. Acuff did the walkthrough on the Thursday before the sale and left." Either Ms. Baker conducted a walkthrough or she did not. From our review, Ms. Baker's testimony indicated that she did, in fact, make a walkthrough:

> Q. Now, let's talk about the Thursday before the sale began on Friday. How much of the organizing and pricing had been done by Thursday morning?
>
> A. We were prepared for her to come and see every single thing with the pricing and I had a conversation with her the night before, as well as text messages that she would be there when she could get there. And I said, well, you need to come and see everything because it is your things and we

want to honor and respect whatever your expectations are. And then you will have an opportunity if you don't want something to be sold at all or if you would like for prices to be different. And she and I had discussed this several times during our other conversations, but the day before the sale - I have the text messages also that she said I'm at the mercy of others because I'm going to lunch in Millington with relatives and they will be bringing me to McVay Trail. And simultaneously to that she said I have been trying to get Erin to come. She has not come and I will see if she will also come tomorrow to see things.

\*\*\*

Q. What happened when Ms. Acuff arrived?

A. . . . . She was noticing various things because we had to move things in order to put like things together and she was commenting on, oh, I love that or, no, I really don't want to sell this. And I know that I was trying to get her to look at all the things. And say let's go to this table and look at this and you tell me if there is anything on here that you want to keep, that you see the pricing is not what you want, and I had a very difficult time getting her attention. These other people that were here were very much distracting her, and again that's okay, but she had several hours to look and say oh, no or yes, that's fine or I want to take that with me. So she was probably there about three or three and a half hours.

From our review, the record also simply does not support the trial court's credibility findings. As such, we reverse the trial court's credibility findings.

## V. Breach of Contract

In her complaint, Ms. Acuff alleged that Ms. Baker breached their oral contract by "selling items for less than reasonable value, for failure to return items not sold, by failing to price antique items for a reasonable market value, and for charging [Ms. Acuff] more than the agreed [contract] price." The trial court found that the parties entered into an oral contract whereby Ms. Baker would conduct an estate sale for Ms. Acuff in exchange for Ms. Baker's payment of three thousand dollars ($3,000.00) plus fifteen percent (15%) of the sale proceeds. A valid, enforceable contract requires consideration and mutual assent, manifested in the form of an offer and an acceptance. Restatement (Second) of Contracts §§ 17, 22. In Tennessee, "[t]he legal mechanism by which parties show their assent to be bound is through offer and acceptance." *Moody Realty Co., Inc. v. Huestis*, 237 S.W.3d 666, 675 n.8 (Tenn. Ct. App. 2007). An enforceable contract "must result from a meeting of the minds, must be based upon sufficient consideration, and must be sufficiently definite to be enforced." *Peoples Bank of Elk Valley v.*

*ConAgra Poultry Co.*, 832 S.W.2d 550, 553 (Tenn. Ct. App. 1991) (citing *Johnson v. Cent. Nat'l Ins. Co. of Omaha*, 356 S.W.2d 277, 281 (Tenn. 1962)). The meeting of the minds requirement is explained as follows:

> "Under general principles of contract law, a contract must result from a meeting of the minds of the parties in mutual assent to the terms." *Sweeten v. Trade Envelopes, Inc.*, 938 S.W.2d 383, 386 (Tenn. 1996) (citation omitted). . . . . "Courts determine mutuality of assent by assessing the parties' manifestations according to an objective standard." [*Moody Realty Co., Inc.*, 237 S.W.2d at 674.]

*In re Estate of Josephson*, No. M2011-01792-COA-R3-CV, 2012 WL 3984613, at *2 (Tenn. Ct. App. Sept. 11, 2012). Thus, the crux of the "meeting of the minds" is mutual assent to a contract. In *Castelli v. Lien*, 910 S.W.2d 420 (Tenn. Ct. App. 1995), this Court explained that,

> [u]nless required by law, contracts need not be in writing in order to be enforceable. *Bill Walker & Assocs., Inc. v. Parrish*, 770 S.W.2d 764, 771 (Tenn. Ct. App. 1989). Oral contracts are enforceable, but persons seeking to enforce them must prove mutual assent to the terms of the agreement, *American Lead Pencil Co. v. Nashville, C. & St. L. Ry.*, 134 S.W. 613, 615 (Tenn. 1910); *Price v. Mercury Supply Co.*, 682 S.W.2d 924, 933 (Tenn. Ct. App. 1984), and must also demonstrate that the terms of the contract are sufficiently definite to be enforceable. *Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n*, 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990); *Oak Ridge Precision Indus., Inc. v. First Tenn. Bank Nat'l Ass'n*, 835 S.W.2d 25, 28 (Tenn. Ct. App. 1992).

*Castelli*, 910 S.W.2d at 426-27. Furthermore,

> [t]he contemplated mutual assent and meeting of the minds cannot be accomplished by the unilateral action of one party, nor can it be accomplished by an ambiguous course of dealing between the two parties from which differing inferences regarding continuation or modification of the original contract might reasonably be drawn. *Batson v. Pleasant View Utility Dist.*, 592 S.W.2d 578, 582 (Tenn. App. 1979); *Balderacchi v. Ruth*, 256 S.W.2d 390, 391 (Tenn. Ct. App. 1953). In addition, a mere expression of intent or a general willingness to do something does not amount to an "offer." *Talley v. Curtis*, 129 S.W.2d 1099, [1102] (Tenn. Ct. App. 1939).
>
>> Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a

- 21 -

contract unless the terms of the contract are reasonably certain.

The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.

The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.

Restatement, Contracts 2d § 33.

*Jamestowne on Signal, Inc.*, 807 S.W.2d at 564.

Here, there was neither mutual assent nor a meeting of the minds between Ms. Acuff and Ms. Baker such that the terms of the purported oral contract were sufficiently definite to be enforceable. Specifically, the parties contradicted each other's testimony regarding their understanding of the agreement. Ms. Acuff testified, in pertinent part:

Q. Did y'all discuss how the items would be valued for the sale price . . . . We're trying to give . . . the Judge a sense of what exactly did you want Ms. Baker to do.

A. I wanted Ms. Baker to do what an estate salesman would do is take my belongings, that were not only precious, but were valuable, even at a reduced rate, that people would buy them because they were pretty, if nothing else, and sell them because I didn't need them, but I still valued them. Then I even asked her, and what you don't sell, then we'll talk about that later. And she said exactly what the other estate sales people told me, that at the end, they would have investors come in and bid on items and we would discuss it, which at another estate sale I had, that's what they did. I took a couple of bids, but I also declined some of the bids on some of the other items.

\*\*\*

Q. Now, at some point, you did reach an agreement with [Ms. Baker] to sell your items at an estate sale; is that correct?

A. I asked her could she bring my shoe repair equipment over to my house and I had another storage house there. And she says, let's go look at it.

And so, we went over to White Station to look at it and when she sees all this, she says, I can sell this too. I can sell that too. You know, I can sell this too.

Q. At any point was there any discussion about extra costs, extra items?

A. No.

Q. Any discussion at all about transportation costs, moving costs, any other fees and expenses beyond the flat fee and the commission that you wanted to pay?

A. Never.

Q. All right. And for the [c]ourt's benefit, and I don't think this is in dispute, the ultimate agreement that you had was to pay her the first $3,000 plus 15 percent?

A. Exactly.

Q. Now, did you have any other agreement with the Defendant, Ms. Baker, other than that?

A. I also asked her could she -- well. I asked -- she had this man that moved things for her. I asked her could he go by Kaye Road and pick up the old refrigerator and she could sell that too. Of course, she could do that.

Q. Did she mention any extra charge for that?

A. No, but she asked me to meet her over on Kaye Road. I did and my son-in-law [Tucker Beck] was there. Well, he owns the house, and I mean, this is a distraught young man who had just lost his wife and he still can't think straight. And he says you can have everything in my attic too. Well, she lit up like a Christmas tree. I mean, you could almost see the cash register going, you know, another attic. You know, I could sell another attic and what have you. Well, it was never discussed with me that that was my obligation. She's the one that went up in the attic with Tucker and looked at the things. I'm still just wondering if they're going to get the refrigerator and bring it over there.

Q. So, your only concern was selling your items at the estate sale?

A. Exactly.

- 23 -

Q. And at no point did you agree to any charges or any expenses beyond the $3,000 plus 15 percent?

A. No.

Ms. Baker testified, in pertinent part:

Q. Was your understanding clear with -- explain to me your understanding of your arrangement with Ms. Acuff as it relates to the McVay Trail property and other work that she asked you to do at White Station.

A. When I initially met with her, and I always have a contract and I have a copy for myself and a copy for the client. And so the second time that I met with her and had Marsha and Susan were also there, I had this contract and she was telling me that she was having difficulty with some of the payments on her taxes. And I said okay, we take the fee from the proceeds of the sale and we're going to have the sale at the end of the month, so I felt comfortable with that. Then when we discussed moving and having items moved from one place to the other, I did indicate that I knew someone that could do that, but that that was not part of this other fee structure.

She also mentioned that her son-in-law, Tucker Beck, had things and had me go there with her. She showed me the room that she wanted to set up as a bedroom there because that would be her place that she come back to stay in Memphis to visit relatives when her house was sold that she need to come and stay, and she and I together went through that room, linen closet, Ike's room, lots of different things, and was very happy that we were taking those things and getting them out of that house. There was no indication that that would be -- some of the things might be part of the sale, but not really.

\*\*\*

Q. Did Ms. Acuff ask you to do anything at that house for Tucker?

A. Yes.

Q. What did she ask you to do?

A. Help him.

Q. And help him do what?

- 24 -

A. Clear out a[n] attic and get a refrigerator moved and look at other things that he might have in the house that he no longer wanted, to get him physically and mentally more settled after the death of his wife.

THE COURT: Okay. Which property is this?

THE WITNESS: Kaye Road.

BY MR. KRAMER:

Q. This is the husband of the young lady that passed away?

A. Her daughter yes, of Lisa.

Q. And was he having a difficult time of things because of that?

A. Yes, very much so.

Q. And is that part of the reason Ms. Acuff asked you to help organize that attic in that house?

A. Yes, that is the entire reason.

Q. Did the house and the attic need organizing?

A. Definitely.

Q. Did you help do that?

A. I did . . . and she said please help him.  Please help Tucker.

***

Q. Ms. Acuff was present when Mr. Beck would explain what he wanted done at that house?

A. Yes.

Q. And she asked that that be done?

A. Yes.

- 25 -

Q. And you did those things?

A. Yes.

Q. Did that involve hiring Charles and other movers?

A. Yes. And getting lots of trash bags and it took multiple trips to do that project. But that was not part of my structure and in no way was I going to include that, except that some of the items might be -- if they were saleable, I explained to both Mr. Beck and June that we would see what we could put in the sale . . . .

*** 

Q. A lot of the items that were in the Kaye Road house, were they taken to the garbage?

A. Correct.

*** 

Q. And did you tell Ms. Acuff that that work at the Kaye Road house would require payment?

A. Yes .

*** 

Q. Did you discuss that with Ms. Acuff?

A. I discussed it with her and told her the approximate cost that it would be for that particular part of the move and that she and I discussed that Tucker would be responsible for that and she said don't bother him with this. We will deal with that later.

Q. And did she tell you that she would pay -- you were going to charge her.

A. Yes. That she wanted that done.

Q. And you had communicated to her that you would be charging her for that?

A. Yes.

Q. And then you, in fact, cleaned out the attic, is that correct?

A. Yes.  It was very labor intensive.

The parties' contradictory testimony clearly demonstrates that they did not achieve a meeting of the minds.  With regard to material terms, the record reflects that the only material term the parties agreed to regarding the purported oral contract was Ms. Baker's fee of three thousand dollars ($3,000.00) plus fifteen percent (15%) of sale proceeds.  What is missing from the alleged contract is agreement as to terms such as: extra costs for cleaning and preparing the houses; costs of transporting items and labor for loading and unloading; how and by whom the antiques would be appraised; minimum prices for items in the sale; security issues; responsibility for lost, damaged or stolen items; how sales would be logged; disposal of remaining items; timeline for payment of sale proceeds; and whether there would be any guarantee on the sale numbers.  *See Estate Sale Contract Guide*, ESTATESALES.ORG, https://estatesales.org/university/estate-sale-contracts-guide (last visited December 12, 2018); WISEESTATESERVICES.COM, https://www.wiseestateservices.com/Contract (last visited December 12, 2018); Marellano, *An Estate Sale Verbal Agreement is Not a Company Contract!*, ESTATE SALES GUIDE (Nov. 4, 2014), http://estatesalesguide.com/liquidation-contract/.  Yet, even in the absence of agreement as to such terms, the trial court found:

> Ms. Baker [was] in breach of contract because she did not provide the services that were being requested.  She did not have a reputable, qualified person to appraise the antiques and the [c]ourt does believe that she held herself out to Ms. Acuff as having the appropriate people to do that.

The record, however, clearly shows that there was no meeting of the minds regarding an appraiser.  The record contains no evidence that Ms. Acuff *requested* a licensed appraiser to appraise the antiques or that Ms. Baker *promised* to provide a licensed appraiser.  Ms. Acuff testified on direct examination:

> Q. In terms of the pricing, who was going to be setting the pricing for these items?  Was it something Ms. Baker was going to do?  You were going to do?  You were going to do it together?
>
> A. It was never discussed.  She was going to have these things appraised.  She assured me that she knew the value of things and she was having an appraiser come in.  I asked more than three times when is the appraisers coming.
>
> Q. Okay.  And what did Ms. Baker say?

A. They will be here.

Q. Before the sale?

A. Right.

Ms. Baker testified on cross-examination:

Q. And you represented to Ms. Acuff that you had an expert appraiser to place values on the items, correct?

A. No, sir.

Q. You didn't?

A. I did not say I had an appraiser.

Q. Really?

A. I never used that term, never, ever. I said I have my associates that are knowledgeable and proficient in pricing, or I'm trying to find the word that I'm looking for, researching and determining what various values might be based on dealers or not just the Internet, but actual dealers that would say yes that is a certain type of antique or it would be something that would be sellable and that kind of thing, that would be considered an antique.

Q. Did you represent to Ms. Acuff that Ms. Colwell is an expert in pricing items?

A. In pricing items?

Q. Yes, for sale.

A. Yes, I did.

Q. You did?

A. Yes. I did not say that she was an appraiser, but I said that that was --

Q. She was an expert?

A. -- an area of the expertise. That she has so many years of experience not only in furniture sales, but as a designer going and researching and findings

items and products for her clients that would be either very high end and she wanted to make sure that they were getting their value.

Q. Okay. And just so the [c]ourt is clear, I want to make sure we are on the exact same page here. At no point did you ever represent Ms. Colwell to be a professional appraiser?

A. No, sir.

Q. Never?

A. Never.

The trial court's ruling, *supra*, ostensibly creates a contract (or material terms thereof) where the parties had none. ***German v. Ford***, 300 S.W.3d 692, 706 (Tenn. Ct. App. 2009) (citing ***Four Eights, LLC v. Salem***, 194 S.W.3d 484, 487 (Tenn. Ct. App. 2005); ***Marshall v. Jackson & Jones Oils, Inc.***, 20 S.W.3d 678, 682 (Tenn. Ct. App. 1999)) ("Courts will not enforce a contract that is vague or indefinite or missing essential terms, and will not make a new contract for the parties.").

> The trial court also found
> that Ms. Baker was in breach of contract for not providing an accounting of her sales. And while that may not have been agreed to, the [c]ourt can construe reasonable terms. There must be some accounting method by which you maintain certain records. There has been no accounting. This is the only thing, Exhibit Number 2, that was provided to Ms. Acuff along with Exhibit 1. While it accounts for the sales, $6,782, it is not consistent with the receipts, which total [$6,332.55].

Turning to the record, when Ms. Acuff was asked about the agreement with Ms. Baker concerning any accounting for sales, she testified, in relevant part, as follows:

Q. Ms. Acuff, did you request an itemization from the Defendant as to what happened to your stuff?

A. Yes.

Q. What did she tell you?

A. I don't remember what she told me because it didn't make any sense and it was gone. You can talk all day long and it won't come back. I mean, it's gone. My question was not what you did with it, but why? Why? I mean, it just -- it doesn't make any sense.

- 29 -

While Ms. Acuff's complaint alleged that "[a]fter approximately 8 days or longer, defendant submitted a list of the items sold," but the description of the items sold made it impossible to identify what items were sold, these facts occurred post-sale. Here, the question is whether there was a contract in place before the sale. Ms. Baker testified:

> Q. . . . At any point did you inform Ms. Acuff before she hired you that you would not be getting her an itemized list of what was going to be sold and what was ultimately sold?
>
> A. That was never part of our discussion, no, sir.

Ms. Acuff's testimony, her complaint, and Ms. Baker's testimony cannot be read in harmony. In short, the conflict between the parties concerning the method of accounting was never resolved or solidified by a meeting of the minds on that point. The trial court's holding, *supra*, which ostensibly charges Ms. Baker with breach for failure to provide an accounting, infers material terms that were never settled between the parties. As such, the trial court again engages in making a contract or creating terms where none exist. *German*, 300 S.W.3d at 706.

The sparse testimonies concerning the parties' alleged contract clearly show that there was no meeting of the minds except as to Ms. Baker's fee. *Castelli*, 910 S.W.2d at 427 ("The parties' differing versions of their contract demonstrate that they did not have a meeting of the minds concerning the essential terms of their agreement."). While Ms. Acuff and Ms. Baker were not required to reduce their agreement to writing, in seeking to enforce the alleged agreement, it was Ms. Acuff's burden to prove: (1) mutual assent to the terms of the agreement; and (2) sufficiently definite terms. *Castelli*, 910 S.W.2d at 426-27. "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Jamestowne on Signal, Inc.*, 807 S.W.2d at 564; Restatement, Contracts 2d § 33. For the foregoing reasons, we conclude that Ms. Acuff failed to meet her burden to show these prima facie requirements. At most, Ms. Acuff proved that there was "an ambiguous course of dealing between the two parties from which differing inferences regarding continuation or modification of the original contract might reasonably be drawn." *Jamestowne on Signal, Inc.*, 807 S.W.2d at 564 (citing *Batson*, 592 S.W.2d at 582; *Balderacchi*, 256 S.W.2d at 391). However, this does not a contract make. Because we reverse the trial court's finding that the parties entered into a valid and enforceable contract, we also reverse the trial court's award, to Ms. Acuff, of thirty-four thousand nine hundred dollars ($34,900.00) in compensatory damages for breach of contract. However, because there was no contract, and because Ms. Baker failed to present any proof concerning the reasonable value of her services, Ms. Acuff is entitled to all proceeds from the sale. Therefore, we affirm the trial court's award of six thousand seven hundred and eighty-two dollars ($6,782.00) in sale proceeds to Ms. Acuff.

## VI. Bailment

The trial court also awarded Ms. Acuff damages on its finding that Ms. Baker engaged in negligent bailment. "A bailment is the delivery of personalty to another for a particular purpose or on mere deposit, on a contract express or implied, that after the purpose has been fulfilled, it shall be redelivered to the person who delivered it, or otherwise dealt with according to his direction or kept until he reclaims it." ***Rhodes v. Pioneer Parking Lot, Inc.***, 501 S.W.2d 569, 570 (Tenn. 1973) (citing ***Jackson v. Metropolitan Government of Nashville***, 483 S.W.2d 92 (Tenn. 1972)). Tennessee Code Annotated section 24-5-111 provides that

> [i]n all actions by a bailor against a bailee for loss or damage to personal property, proof by the bailor that the property was delivered to the bailee in good condition and that it was not returned or redelivered according to the contract, or that it was returned or redelivered in a damaged condition, shall constitute prima facie evidence that the bailee was negligent, provided the loss or damage was not due to the inherent nature of the property bailed.

Tenn. Code Ann. § 24-5-111. Here, Ms. Acuff alleges that she delivered her property for the estate sale to Ms. Baker and that Ms. Baker was negligent by either failing to return certain property, or allowing Ms. Acuff's property to be lost or stolen while under Ms. Baker's care.

The trial court found, in pertinent part:

> As it relates to the bailment, I think that my ruling on the breach of contract in terms of the amount of damages would apply to the bailment. I do believe that these items were entrusted to Ms. Baker. That they were delivered to her for purposes of the sale. That she took actual possession of these items. After Ms. Acuff did the walkthrough on the Thursday before the sale and left. These items were entrusted to Ms. Baker at that time.

> ***

> So the Court is not persuaded that some of these other items that were on the list were not sold, but the clocks and the Items 1 through 3 were clearly covered under a bailment and were not returned back to their owner. So the Court is not going to duplicate the damages. The Court is going to award the same $34,900 under the theory of a bailment.

The trial court's ruling was made under its assumption that the parties had a valid enforceable oral contract. For the reasons discussed above, this Court concludes that

there was not a valid contract. In view of our holding, the prima facie case for bailment requires exclusive possession by the bailee. As discussed by the Tennessee Supreme Court in ***Rhodes v. Pioneer Parking Lot, Inc.***,

> [t]he creation of a bailment in the absence of an express contract requires that possession and control over the subject matter pass from the bailor to the bailee. In order to constitute a sufficient delivery of the subject matter there must be a full transfer, either actual or constructive, of the property to the bailee *so as to exclude it from the possession of the owner and all other persons and give to the bailee, for the time being, the sole custody and control thereof.* See ***Jackson v. Metropolitan Government of Nashville***, *supra*, ***Scruggs v. Dennis***, 440 S.W.2d 20 (Tenn. 1969); ***Old Hickory Parking Corp. v. Alloway***, 177 S.W.2d 23 (Tenn. Ct. App. 1944). *See generally*, 8[A] Am. Jur. 2d . . . .

***Rhodes***, 501 S.W.2d at 570 (emphasis added).

In the absence of a contract, Ms. Acuff has the burden to show: (1) that there was a full transfer of her property to Ms. Baker; and (2) that the property was excluded from Ms. Acuff's possession and from all other persons such that Ms. Baker had sole custody and control of it. *See **id.*** Turning to the record, the evidence preponderates against a finding that Ms. Baker possessed sole custody over the estate sale items. Multiple witnesses for both parties testified that Ms. Baker was not the only person with a key to the McVay house where the estate sale items were kept prior to and after the sale. Both Ms. Acuff's son-in-law and Ms. Acuff's real estate agent had keys to the McVay house. Additional testimony demonstrated that many of Ms. Acuff's family members came to the house the day before the sale. Furthermore, many witnesses testified that Ms. Acuff's daughter, Ms. Galtelli, arrived at the McVay home the day before the sale and took items from the house that were meant for the sale. When Ms. Baker asked Ms. Acuff whether Ms. Galtelli was allowed to take the items, Ms. Acuff explained that she could take whatever she wanted. Because there was not a full transfer of the estate sale property from Ms. Acuff to Ms. Baker, Ms. Baker did not obtain sole custody and control of the property and a bailment, without contract, was not created. For these reasons, we conclude that the trial court erred in awarding Ms. Acuff thirty-four thousand nine hundred dollars ($34,900.00) in damages for negligent bailment, and we reverse this award.

## VII. Tennessee Consumer Protection Act

Ms. Acuff also alleges that Ms. Baker violated the TCPA.[7] "The [Tennessee]

---

[7] The TCPA only applies to defendants who are engaged in "trade or commerce." Tenn. Code Ann. § 47-18-104(a). This is a fact intensive inquiry. ***Fayne v. Vincent***, 301 S.W.3d 162, 174 (Tenn.

Consumer Protection Act declares unlawful, various unfair or deceptive acts or practices which affect the conduct of any trade or [commerce]. [Tenn. Code Ann. § 47-18-104(a)]. Any person suffering a loss as a result of such acts or practices may bring an action for damages. [Tenn. Code Ann. § 47-18-109]." *Humphries v. W. End Terrace, Inc.*, 795 S.W.2d 128, 131-32 (Tenn. Ct. App. 1990). The factual allegations pertaining to this claim are that Ms. Baker misrepresented that she had a professional antique appraiser and that she had experience conducting estate sales.

> In her complaint, Ms. Acuff alleged, in relevant part:
>
> 4. Defendant represented her company to have experience with estate sales and particularly valuation of antique items. Plaintiff asserts that she owned numerous antique items and wanted to sell same at a fair market price.
>
> 5. Although defendant claimed to have an expert who would discuss the reasonable value of antiques owned by the plaintiff, no such discussion occurred and no such person was part of defendant's organization.

Importantly, Ms. Acuff's complaint does not specify which sections of the TCPA Ms. Baker allegedly violated. Rather, the complaint avers only:

> Plaintiff alleges that the defendant violated the Tennessee Consumer Protection Act **by her deceptive practices that damage[d] the plaintiff**.

(Emphasis added). Despite the fact that Ms. Acuff did not state the specific section(s) of the TCPA applicable to her claim, the trial court held that Ms. Acuff met her burden to show that Ms. Baker violated the Act:

> Finally, Ms. Acuff has alleged violation of the Tennessee Consumer Protection law, which is codified at Tennessee Code Annotated 47-18-104 and I'm not going to go through the entire statute, but Ms. Acuff has essentially alleged violation [of] specifically 47-18-104(b)(5), (b)(7) and (b)(12). Of course, (b)(5) is representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or

---

2009). In *Fayne*, the Tennessee Supreme Court outlined factors to consider in determining whether a defendant is engaged in trade or commerce. *Id.* at 174-75. For example, "the frequency with which the seller has engaged in similar transactions . . . ." *Id.* at 175. In its oral ruling, the trial court found that Ms. Baker "represented herself to be a professional estate planner, not someone who was just dipping and dabbing and trying to help out." The trial court, however, did not elaborate or specifically state its reason for finding the TCPA applicable to Ms. Baker's work. The parties do not raise the threshold issue of whether the trial court erred in its finding that the TCPA applied to Ms. Baker. Nonetheless, in the interest of full adjudication, we will assume, for purposes of this appeal, that the TCPA applies to the type of work at issue here, although we make no substantive holding on the question.

quantities that they do not have or that a person has a sponsorship approval, status, affiliation or connection that such person does not have; (b)(7) representing the goods or services are of a particular standard, quality or grade or that the goods are of a particular style or model if they are of another; and then (12) representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involved or which are prohibited by law.

***

The final claim is the Tennessee Consumer Protection Act, which Ms. Acuff would have to show that Ms. Baker -- that her practices were either deceptive or unfair. I think Ms. Acuff has met her burden of proof to demonstrate by a preponderance of the evidence her claim under the Tennessee Consumer Protection Act.

Specifically, the [c]ourt does find that Ms. Baker has intentionally misrepresented the qualifications of her service with regard to having a professional appraiser who would come in and value the property including the antiques specifically, that she held herself out as having the experience and the experienced associates, or specifically, a professional appraiser who would come in and appraise this property. It is clear that Ms. Colwell is not a professional appraiser.

***

The Court does find that Ms. Acuff has also met her burden of proof under 47-18-104(b)(7) representing that goods or services are of a particular standard, quality, or grade or that goods are at a particular style or model if they are of another.  As it relates to services, services of a particular standard, quality or grade.  Ms. Baker held herself out as being an experienced estate planner or a person who does estate sales.  She came, I'm not going to say highly recommended, but came recommended, and the [c]ourt is of the opinion that she sold herself and reassured Ms. Acuff that she was able to perform this service that Ms. Acuff needed.  She has hired individuals who don't have any licenses or certifications. Hired gentlemen to do moving and perhaps these gentlemen have worked for her over a period of time.  There is no evidence in terms of whether or not they have any bonding, whether they are bonded.  These individuals who are going to be in this home, conducted the sale, how they were going to secure the property, how Ms. Baker would deal with situations where property was broken or missing.  You know, you have to have a professional staff.  You have to have people in place that you can trust.  The [c]ourt is of the

- 34 -

opinion that Ms. Baker tried to cut costs and that she had either people that she knew or business associates that, you know, that she felt could do the job, but obviously these people just were not qualified to run this sale and to secure this property.

So the [c]ourt is of the opinion that Ms. Baker misrepresented the quality of her services. She represented herself to be a professional estate planner, not someone who was just dipping and dabbing and trying to help out. . . . . So, the [c]ourt is going to allow Ms. Acuff to recover her attorney[']s fees and by law she's entitled to treble damages.

The [c]ourt does find that Ms. Baker's practices were deceptive, that they were unfair and that they caused Ms. Acuff to incur damages in the amount of - the $[34,900] for the items that I've previously stated as well as the $6,782 that was collected for the property that was sold that Ms. Baker says was the total amount of her sale.

From the foregoing statements, it is clear that the trial court found that Ms. Baker violated sections 47-18-104(b)(5), 47-18-104 (b)(7), and 47-18-104 (b)(12) of the TCPA. Those sections provide:

(b) The following unfair or deceptive acts or practices affecting the conduct of any trade or commerce are declared to be unlawful and in violation of this part:

***

(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship approval, status, affiliation or connection that such person does not have;

***

(7) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;

***

(12) Representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have

- 35 -

or involve or which are prohibited by law;

\*\*\*

Tenn. Code Ann. § 47-18-104(b)(5), (b)(7), (b)(12).

The trial court awarded treble damages (3 x $41,682.00) for violation of the TCPA, and entered judgment in favor of Ms. Acuff for one hundred and twenty-five thousand forty-six dollars ($125,046.00). The trial court also awarded Ms. Acuff attorney's fees and costs in the amount of thirty-two thousand one hundred and forty-four dollars and ninety-eight cents ($32,144.98).

From our review, we conclude that the evidence preponderates against the trial court's finding that Ms. Baker intentionally misrepresented that she had a professional appraiser who could value Ms. Acuff's antiques. Tenn. Code Ann. § 47-18-104(b)(5). Both Ms. Baker and Ms. Colwell testified that neither of them represented to Ms. Acuff, that Ms. Colwell was a professional appraiser. Although Ms. Acuff testified that Ms. Baker informed her she would have an appraiser value the antiques, in view of our reversal of the trial court's credibility findings, her testimony does not carry more weight than that of the other two witnesses who stated the opposite.

We also conclude that the evidence preponderates against the trial court's finding that Ms. Baker misrepresented the quality of her services. Tenn. Code Ann. § 47-18-104(b)(7). As set out above, the trial court's ruling concerning the TCPA, like its ruling on the contract issue, outlines certain material terms or requirements that Ms. Baker allegedly breached. In short, the trial court erred when it implicitly concluded that Ms. Baker violated the TCPA because she did not perform material terms of a contract that did not exist. Although violation of the TCPA may be found in the absence of a contract, "[a] party bringing a TCPA action must prove that there was some deception, misrepresentation or unfairness, regardless of any breach of contract." *Hall v. Hamblen*, No. M2002-00562-COA-R3-CV, 2004 WL 1838180, at \*4 (Tenn. Ct. App. Aug. 16, 2004) (citing *Hamer v. Harris*, No. M2002-00220-COA-R3-CV, 2002 WL 31469213, at \*1, (Tenn. Ct. App. Nov. 6, 2002)). Here, the evidence simply does not show, by a preponderance, that Ms. Baker engaged in any deception. While it is clear that there were myriad disagreements between the parties regarding their agreement and the scope of Ms. Baker's work, disagreement is not deception.[8] Accordingly, Ms. Acuff is not entitled to treble damages or attorney's fees and costs under the TCPA. *Hall*, 2004 WL

---

[8] While the trial court did not address Tennessee Code Annotated section 47-18-104(b)(12) in its order, for the sake of finality, we also conclude that there is no evidence in the record to demonstrate that Ms. Baker represented that her agreement with Ms. Acuff "confer[red] or involve[d] rights, remedies or obligations that it [did] not have or involve or which [were] prohibited by law." Tenn. Code Ann. § 47-18-104(b)(12).

1838180, at *3 ("To be awarded attorney's fees under the TCPA, a plaintiff must be successful on his or her TCPA claim and the court must find the defendant violated the Act.").

## VIII. Conclusion

For the foregoing reasons, we reverse the trial court's order with the sole exception of its award of six thousand seven hundred and eighty-two dollars ($6,782.00) to Ms. Acuff. We remand for entry of judgment in favor of Ms. Acuff in this amount and for any further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed against the Appellee, June Acuff, for all of which execution may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE